2004-NMSC-026

96 P.3d 778

Phillip CORDOVA, Petitioner,

v.

Tim LeMASTER, Warden, Respondent.

No. 26,512.

Supreme Court of New Mexico.

July 13, 2004.

Brian A. Pori, Inocente, P.C., Albuquerque, for Petitioner.

Patricia A. Madrid, Attorney General, Ralph E. Trujillo, Assistant Attorney General, Albuquerque, for Respondent.

## OPINION

MINZNER, Justice.

{1} Petitioner appeals, pursuant to Rule 5–802 NMRA 2004, from action taken by the

district court on his petition for habeas corpus. The district court awarded Petitioner additional good-time credits but otherwise denied the relief requested. We granted certiorari pursuant to Rule 12–501 NMRA 2004. On appeal, Petitioner contends that he was transferred in retaliation for protected activities, that he was indefinitely deprived of spousal visitation without due process, and that prison officials have been deliberately indifferent to his medical needs. We agree with Petitioner that spousal visitation should not have been terminated indefinitely without notice and an opportunity to be heard. We otherwise affirm the district court's ruling. We remand this matter to the district court for further proceedings consistent with this opinion.

**I**

{2} Petitioner testified that in 1984, while confined in the Penitentiary of New Mexico, he began representing inmates in bringing grievances to the attention of prison officials. He also helped other prisoners with legal matters. In support of a claim that there was a pattern of retaliation for complaints, for example, Petitioner testified he complained in 1992 about a deputy warden. Later that same year, he was transferred to the Ely State Prison in Nevada. During his confinement in Nevada, Petitioner filed *pro se* his habeas corpus petition requesting the reinstatement of good-time credits. In 1997, he was returned from Ely State Prison to the Penitentiary of New Mexico before being transferred to the Central New Mexico Correctional Facility in Los Lunas.

{3} Petitioner was transferred again in 1998 to the Torrance County Detention Center in Estancia. He testified that when he was confined in Estancia he reported to authorities that he had witnessed correctional officers abuse another inmate. Thereafter, he was returned to the Penitentiary of New Mexico. While in Estancia, Petitioner's visits with his wife were initially suspended for a limited period and later indefinitely suspended, because authorities believed she had received money from other inmates and suspected she was involved in smuggling drugs into the facility. When she petitioned the Director of Adult Prisons to reinstate her visits, her request was denied.

{4} In February, 1999, Petitioner's supplemental habeas corpus petition was filed. Petitioner alleged that prison officials had retaliated against him for pursuing grievances and refusing to cooperate with them in investigating gang activity. He also argued he had been denied due process when spousal visitation had been suspended indefinitely and that he had been subject to cruel and unusual punishment because prison officials had been deliberately indifferent to his medical needs. He noted, for example, that when he was confined in Los Lunas, the facility was experiencing an outbreak of hepatitis B, and at one point he was placed in a cell with an inmate who was infected. He also noted that after he was returned from Estancia to Santa Fe, he was informed by medical staff that he had tested positive for hepatitis B. He alleged that several times during 1998 he requested treatment but medical officials refused to provide treatment other than prescribing medication for an upset stomach. Petitioner also alleged that in late 1998, while he was confined in the Penitentiary of New Mexico, prison officials told him that unless he cooperated with an investigation of prison gangs he would be transferred to an out-of-state prison, he would not receive medical care, and his wife could not visit him.

{5} In September, 1999, while the matter was under consideration before the district court and before the court could issue a written decision, 106 New Mexico prisoners were transferred to Wallens Ridge Prison in Virginia. Petitioner was not in this group of transferees. Approximately three weeks later, a second group of prisoners, including Petitioner, was transferred to Wallens Ridge. Petitioner's counsel immediately filed a motion asking the district court, based on accounts of abuse at Wallens Ridge, to order that Petitioner be returned to New Mexico and that no further transfer occur until the court had the opportunity to rule on all of the claims raised in the supplemental petition. Shortly thereafter, the court granted the motion. The court conducted multiple hearings, and heard some testimony in camera.

{6} In a letter ruling in May, 2000, the district court issued its findings of fact and conclusions of law. In denying Petitioner's claim that his transfer to Virginia was retaliatory in nature, the court concluded that Petitioner was not singled out, but rather the transfer was an administrative decision that affected more than a hundred inmates. The district court noted that it had reviewed videotapes of the intake process at Wallens Ridge for both groups of New Mexico inmates, and that "[t]he allegations of mistreatment [were] not supported by the tapes." In denying Petitioner's claim that the indefinite denial of spousal visitation violated due process, the court concluded that the termination of all spousal visits was not retaliatory but rather had been based on "information that continued visits could threaten the security of the institution." Finally, in denying Petitioner's claim that he had been subjected to cruel and unusual punishment, the court concluded that Respondent did not intentionally expose Petitioner to the hepatitis virus, and Respondent "provided the care that Petitioner is entitled to." The district court's order on the petition for habeas corpus was filed July 18, 2000.

{7} Petitioner timely filed his petition for writ of certiorari pursuant to Rule 12–501. The resolution of the issues raised on appeal has been delayed an unusually long time. Much of the delay occurred as a result of missing portions of the record and related extensions of the briefing schedule. The district court settled the record pursuant to Rule 12–211(H) NMRA 2004, and a supplemental record proper was filed in August, 2003. This court heard oral argument in February, 2004, following additional extensions of the briefing schedule. We now address each of Petitioner's contentions.

## II

{8} In making his constitutional claims, Petitioner cites Article II, Sections 13 and 18 of the New Mexico Constitution, which are our state counterparts to the Eighth and Fourteenth Amendments to the United States Constitution. He does not argue, however, that we should interpret our state constitution to provide Petitioner greater protection than he is afforded by the federal constitution and has not articulated a basis for construing the state constitutional provisions more broadly than the federal. We therefore address his claims only under the federal provisions. *See Compton v. Lytle,* 2003–NMSC–031, ¶ 23 n. 4, 134 N.M. 586, 81 P.3d 39.

{9} Also, as an initial matter, we note that a petition for a writ of habeas corpus is an appropriate procedure by which an inmate may challenge his or her conditions of confinement. *See Preiser v. Rodriguez,* 411 U.S. 475, 499–500 & n. 15, 93 S.Ct. 1827, 36 L.Ed.2d 439; *see also* 1 Randy Hertz & James S. Liebman, *Federal Habeas Corpus Practice and Procedure* § 9.1, at 431–437 & n. 34 (4th ed.2001). Habeas corpus is not the only available remedy; an inmate may choose to file a civil rights lawsuit attacking his or her conditions of confinement under the Civil Rights Act of 1871, 42 U.S.C. § 1983. *See Preiser,* 411 U.S. at 499, 93 S.Ct. 1827. Thus, cases involving Section 1983 challenges to conditions of confinement are relevant in evaluating Petitioner's claims on appeal.

{10} In appeals from habeas corpus proceedings, findings of fact of the trial court are reviewed to determine if substantial evidence supports the court's findings. *Lytle v. Jordan,* 2001–NMSC–016, ¶ 28, 130 N.M. 198, 22 P.3d 666. In that review, "evidence is viewed in the light most favorable to the prevailing party and all inferences arising from the factual findings of a trial court are indulged in." *Aken v. Plains Elec. Generation & Transmission Coop., Inc.,* 2002–NMSC–021, ¶ 19, 132 N.M. 401, 49 P.3d 662. Claims involving the denial of procedural due process are questions of law, which we review de novo. *State ex rel. Children, Youth & Families Dep't v. Ruth Anne E.,* 1999–NMCA–035, ¶ 22, 126 N.M. 670, 974 P.2d 164.

## A

{11} We first address Petitioner's claim that he was transferred because he repeatedly challenged his own conditions of confinement, as well as those of other in-

mates. He argues these transfers were "official acts of retaliation." It is well-established that prisoners' right of access to the courts is a fundamental right protected by the Constitution. *Bounds v. Smith,* 430 U.S. 817, 821, 97 S.Ct. 1491, 52 L.Ed.2d 72 (1977). Thus, prison officials may not retaliate against or otherwise harass an inmate because he or she has exercised this right. *Smith v. Maschner,* 899 F.2d 940, 947 (10th Cir.1990). Even though the discretion afforded prison administrators "is extremely broad," prison officials may not employ otherwise legitimate transfers as retaliatory tools against an inmate who has exercised his or her right to access the courts. *McDonald v. Hall,* 610 F.2d 16, 18 (1st Cir.1979).

{12} In order to prevail on a claim of retaliation, the inmate must prove that the actual motivating factor precipitating the transfer was retaliatory. *Id.* In other words, the inmate must prove that "but for" the allegedly retaliatory motive, he or she would not have been transferred. *Id.; see also Smith,* 899 F.2d at 949–50. Once an inmate has made a prima facie showing of retaliation, prison officials "must show that they had a non-retaliatory motive for taking the action and that the adverse action would have taken place in any event due to this proper motive." *Griffin v. Thomas,* 2004-NMCA-088, ¶ 36, 95 P.3d 1044, 1053 (N.M.Ct. App. 2004). A transfer is not retaliatory if it is "reasonably related to legitimate penological interests." *Frazier v. Dubois,* 922 F.2d 560, 562 (10th Cir.1990) (quoting *Turner v. Safley,* 482 U.S. 78, 89, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987)).

{13} Petitioner contends that in 1992, shortly after he presented several grievances regarding allegedly unconstitutional conditions of confinement at the Penitentiary of New Mexico, including his complaint against a deputy warden, he was scheduled for transfer to a prison in Nevada. He claims the timing of this transfer is "highly probative" of the Department of Corrections' attempt to silence him. The amended petition on which the district court ruled appears to rely on this transfer, and others prior to the transfer to Wallens Ridge, as evidence of a retaliatory motive, rather than actions to be remedied.

At oral argument, counsel indicated Petitioner is now confined in Oklahoma, rather than Wallens Ridge. We address the transfer to Nevada as evidence of a retaliatory motive. We address the transfer to Wallens Ridge as the condition of confinement at issue, even though Petitioner apparently has been moved. *See Mowrer v. Rusk,* 95 N.M. 48, 51, 618 P.2d 886, 889 (1980).

{14} We will assume for purposes of this appeal that Petitioner made a prima facie showing of retaliation based on the number and timing of transfers. At the hearing on Petitioner's habeas petition, however, an investigator for the Department of Corrections testified that between ten and fifteen different sources provided information prior to Petitioner's transfer to Nevada that he was a member of a prison gang. Moreover, at least five sources suggested that not only was Petitioner a gang member, but he intended to commit or have other inmates commit violent acts against another inmate. On this record, the district court did not err in determining that Petitioner's 1992 transfer to Nevada was reasonably related to the legitimate penological interest of preserving inmate safety. *See Peterson v. Shanks,* 149 F.3d 1140, 1144 (10th Cir.1998) (concluding that transfer to another facility is a reasonable means of meeting the legitimate penological interest of preserving an inmate's safety). We acknowledge that much if not all of this information was confidential, but the question for the trial court was not the accuracy of the information but the adequacy of the proof of a retaliatory motive. We think the district court was entitled to find against Petitioner on this claim.

{15} Petitioner also contends that in 1999 prison officials transferred him to Wallens Ridge, a notoriously dangerous prison in Virginia, when he refused to cooperate with a prison investigation. Following a riot at the Guadalupe County Correctional Facility, however, the Department of Corrections had a shortage of maximum security beds. Accordingly, the decision was made to transfer inmates who were in administrative segregation. This decision affected over 100 inmates and required two separate transfers. The Secretary of the Department of Corrections

testified at the hearing below that Wallens Ridge was the only out-of-state facility that would take New Mexico inmates without requiring New Mexico to receive inmates in return. The district court was entitled to determine that the transfer of Petitioner to Wallens Ridge also was reasonably related to legitimate penological interests.

{16} We conclude the district court's determination that official retaliation was not the "but for" motive behind Petitioner's out-of-state transfers was supported by substantial evidence. We therefore affirm the district court on this issue. We next address Petitioner's claim that spousal visitation was indefinitely suspended without due process.

**B**

{17} The Fourteenth Amendment states in part: "nor shall any State deprive any person of life, liberty, or property, without due process of law." Petitioner argues that the Department of Corrections indefinitely suspended his spousal visitation without providing him the process to which he was constitutionally entitled. We examine Petitioner's procedural due process claim in two steps. First, we determine whether he has a liberty interest in spousal visitation that has been interfered with by the Department of Corrections. *See Kentucky Dep't of Corrections v. Thompson,* 490 U.S. 454, 460, 109 S.Ct. 1904, 104 L.Ed.2d 506 (1989). Second, because we conclude that Petitioner does have such a liberty interest under existing regulations, we determine the minimum procedures that he must be afforded before the Department of Corrections deprives him of that liberty interest. *See id.*

{18} The United States Supreme Court has long stated that protected liberty interests "may arise from two sources—the Due Process Clause itself and the laws of the States." *Hewitt v. Helms,* 459 U.S. 460, 466, 103 S.Ct. 864, 74 L.Ed.2d 675 (1983). In *Thompson,* the Supreme Court held that "[t]he denial of prison access to a particular visitor is well within the terms of confinement ordinarily contemplated by a prison sentence and therefore is not independently protected by the Due Process Clause." 490 U.S. at 461, 109 S.Ct. 1904 (quotation marks

and quoted authority omitted). Thus, Petitioner is left with the task of showing that he has a protected liberty interest in spousal visitation that is derived from Department of Corrections regulations.

{19} Prior to *Sandin v. Conner,* 515 U.S. 472, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995), when faced with a due process claim based on state statutes or prison regulations, courts were required to determine whether language existed creating "substantive predicates" to guide official discretion and whether the regulations contained "explicitly mandatory language." *See Thompson,* 490 U.S. at 463, 109 S.Ct. 1904 (requiring the language to contain " 'explicitly mandatory language,' *i.e.,* specific directives to the decisionmaker that if the regulations' substantive predicates are present, a particular outcome must follow, in order to create a liberty interest"); *Hewitt,* 459 U.S. at 472, 103 S.Ct. 864 ("[W]e are persuaded that the repeated use of explicitly mandatory language in connection with requiring specific substantive predicates demands a conclusion that the State has created a protected liberty interest."). However, in *Sandin,* the Supreme Court abandoned that approach; the Court reasoned that approach "create[d] disincentives for States to codify prison management procedures in the interest of uniform treatment" and "led to the involvement of federal courts in the day-to-day management of prisons, often squandering judicial resources with little offsetting benefit to anyone." 515 U.S. at 482, 115 S.Ct. 2293.

{20} Consequently, the Court in *Sandin* concluded that while states may create liberty interests protected by the Due Process Clause, "these interests will be generally limited to freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force, nonetheless imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Id.* at 484, 115 S.Ct. 2293. After *Sandin,* in order to find Petitioner has a constitutionally protected liberty interest in spousal visitation, we must first determine whether regulations exist that limit official discretion in indefinitely

depriving Petitioner of spousal visitation, and if so, whether the indefinite deprivation of spousal visitation is an atypical and significant hardship. For the reasons that follow, we hold Petitioner has a liberty interest, conferred by Department of Corrections regulations, to spousal visitation, which if indefinitely deprived would impose upon him an atypical and significant hardship.

{21} In the state prison regulations governing visitation, "major violation" is defined as "[a]n infraction of policy or law relating to visiting that the Warden or designee has determined by *clear and convincing evidence* to constitute a threat to the safety and security of the facility or which threatens the life or the well being of staff, inmates, visitors or volunteers." New Mexico Corrections Department, Policy No. 100200, *available at http://corrections.state.nm.us/policy/policyprog.htm* (last revised July 1, 2003) (emphasis added). The regulations further provide that "[a] major violation committed by a visitor *will* result in a permanent termination of visiting privileges from any and all New Mexico correctional facilities, whether State or privately operated." *Id.,* Policy No. 100201(D) (emphasis added). In these regulations, the Department of Corrections has used "language of an unmistakably mandatory character," *Hewitt,* 459 U.S. at 471, 103 S.Ct. 864; therefore, regulations do exist that limit the discretion of prison officials to bar visitation. Before finding a liberty interest, though, we must determine whether the permanent or indefinite deprivation of spousal visitation would be "the type of atypical, significant deprivation in which a State might conceivably create a liberty interest." *Sandin,* 515 U.S. at 486, 115 S.Ct. 2293.

{22} The Supreme Court's recent opinion in *Overton v. Bazzetta,* 539 U.S. 126, 123 S.Ct. 2162, 156 L.Ed.2d 162 (2003), provides some guidance in making this determination. In *Overton,* the Court addressed a prison regulation adopted by the Michigan Department of Corrections that sought to control the widespread use of drugs by prisoners among inmates by providing that inmates who commit multiple substance-abuse violations would not be permitted to receive any visitors other than attorneys or the clergy.

*Id.* at 130, 123 S.Ct. 2162. Once that punishment was imposed on an inmate, that inmate could seek to have his visitation rights reinstated after two years; reinstatement was then solely within the warden's discretion. *Id.* The Court considered whether this regulation infringed on inmates' constitutional right of association. *Id.* at 131, 123 S.Ct. 2162.

{23} The *Overton* Court applied four factors in determining whether the Michigan prison regulation withstood constitutional challenge: (1) whether the regulation was rationally related to a legitimate penological interest; (2) whether the inmates had alternative means of exercising their asserted right of association; (3) the impact accommodation of the inmates' asserted associational rights would have on guards, inmates, and prison resources; and (4) the presence of ready alternatives to the regulations. *Id.* at 132, 123 S.Ct. 2162 (citing *Turner v. Safley,* 482 U.S. 78, 89–91, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987)). In applying these factors, the Court stated the regulation serves the legitimate goal of deterring drug and alcohol use in prison, *id.* at 134, 123 S.Ct. 2162; the inmates were still able to communicate with persons outside of prison by mail or telephone, *id.* at 135, 123 S.Ct. 2162; accommodating the inmates would cause a reallocation of financial resources and compromise the safety of visitors, *id.;* and no ready alternatives to the regulation exist, *id.* at 136, 123 S.Ct. 2162. In short, the Michigan regulation at issue was "not a dramatic departure from accepted standards for conditions of confinement." *Id.* at 137, 123 S.Ct. 2162. The Court concluded:

> If the withdrawal of all visitation privileges were permanent or for a much longer period, or if it were applied in an arbitrary manner to a particular inmate, the case would present different considerations. An individual claim based on indefinite withdrawal of visitation or denial of procedural safeguards, however, would not support the ruling of the Court of Appeals that the entire regulation is invalid.

*Id.*

{24} By this language, we believe the Supreme Court implicitly recognized that the

withdrawal of an individual inmate's visitation privileges without affording that inmate certain procedural safeguards would violate the Due Process Clause. This recognition is likely based on the importance of visitation to inmates. Visitation has been widely recognized as indispensable to rehabilitation. *See Brandon v. Dep't of Corr.*, 938 P.2d 1029, 1032 n. 2 (Alaska 1997). As Justice Marshall stated in his dissenting opinion in *Thompson:* "Confinement without visitation 'brings alienation and the longer the confinement the greater the alienation. There is little, if any, disagreement that the opportunity to be visited by friends and relatives is more beneficial to the confined person than any other form of communication.'" 490 U.S. at 468, 109 S.Ct. 1904 (Marshall, J., dissenting) (quoting National Conference of Commissioners on Uniform State Laws, Model Sentencing and Corrections Act § 4–115, Comment (1979)). As such, we conclude that the indefinite suspension of spousal visitation in this case was an atypical and significant hardship on Petitioner in relation to the ordinary incidents of prison life. *See Bazzetta v. McGinnis*, 286 F.3d 311, 323 (6th Cir.2002), *rev'd on other grounds*, 539 U.S. 126, 123 S.Ct. 2162, 156 L.Ed.2d 162 (2003) ("A complete ban on all visitors cuts the prisoner off from all personal ties, constituting qualitatively greater isolation than is imposed by a prison sentence, and is an atypical and significant hardship far beyond the expected hardships of prison.").

{25} Having determined that Petitioner has a liberty interest under existing regulations, we next address the process he should have been afforded. The Supreme Court has stated that inmates in prison disciplinary proceedings are not entitled to "the full panoply of rights" afforded defendants in a criminal prosecution. *Wolff v. McDonnell*, 418 U.S. 539, 556, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974). Rather, Petitioner is entitled "to those minimum procedures appropriate under the circumstances and required by the Due Process Clause to insure that the state-created right is not arbitrarily abrogated." *Id.* at 557, 94 S.Ct. 2963. In determining the minimum procedures to which Petitioner was entitled, we analyze the governmental and private interests affected:

First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Mathews v. Eldridge*, 424 U.S. 319, 335, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976). The weight or value of the private interest is clear and significant, and we need not address the first factor any further.

{26} With respect to the second factor, we note that Petitioner was not given notice of any kind. He was not given an opportunity to be heard or present evidence. He was given no written statement prepared by an impartial factfinder regarding the evidence and reasons for deprivation. Because there was no hearing of any kind, he was not able to confront his accusers or cross-examine any witnesses. In fact, he was not afforded any kind of procedure before or after being indefinitely deprived of spousal visitation. Under these circumstances, the risk of erroneous deprivation unquestionably was heightened, and the probable value of having employed at least some procedural safeguards is considerable.

{27} Petitioner's private interest must be weighed against the government's interest, particularly the fiscal and administrative burdens that procedural safeguards would entail. Affording prisoners the opportunity to confront accusers and cross-examine witnesses in every instance of a visitation denial would, in all probability, constitute too heavy a burden on the government's interest in the efficient administration of prisons. It has been observed that "[i]f confrontation and cross-examination of those furnishing evidence against the inmate were to be allowed as a matter of course, as in criminal trials, there would be considerable potential for havoc inside the prison walls." *Wolff*, 418 U.S. at 567, 94 S.Ct. 2963.

{28} Nevertheless, Petitioner should have been given: (1) advance written notice of the charge; (2) an opportunity to be heard, to present evidence, and to rebut the evidence against him, in such a manner that would not be unduly hazardous to institutional safety or correctional goals; and (3) a written statement prepared by an impartial factfinder as to the evidence relied on and the reasons for the disciplinary action, including the length of time chosen for discipline. *See id.* at 563–66, 94 S.Ct. 2963. The Due Process Clause also requires that at the very least there be "some evidence" in the record that supports the decision reached by the Department of Corrections. *Superintendent v. Hill,* 472 U.S. 445, 455, 105 S.Ct. 2768, 86 L.Ed.2d 356 (1985). However, the prison regulations require more than "some evidence" to support the action taken—the regulations provide that such an action must be supported by "clear and convincing evidence." *See supra* ¶ 21. Petitioner has an expectation based on prison regulations that he would not be indefinitely deprived of spousal visitation, unless the Department of Corrections has clear and convincing evidence of a major violation.

{29} On appeal, Respondent contends that the indefinite suspension of spousal visitation in this case was based on information that Petitioner's wife was helping him with drug trafficking within the prison, which Petitioner denies, and his wife had confessed to receiving money from Petitioner and other inmates under illicit circumstances, which Petitioner also denies. We assume without deciding that under some circumstances, even under existing regulations, visitation may be summarily suspended and a post-suspension hearing provided. In this case, no process was provided, and no reason has been offered for extending the initial suspension indefinitely. We conclude Respondent indefinitely denied spousal visitation to Petitioner without affording him the minimum level of procedural due process to which he was entitled. We note that the district court did not resolve this particular issue, perhaps because Petitioner's theory of retaliatory motive may have appeared during the hearings to encompass the denial of spousal visitation. We believe there was substantial evidence to support the district court's determination that spousal visitation was not denied in retaliation for protected activities. Petitioner's due process claim having been pled and argued, however, we choose to address it in this opinion rather than remand, in light of our original jurisdiction over petitions for habeas corpus. N.M. Const. art. VI, § 3. We therefore hold that Respondent should reinstate the spousal visitation suspended indefinitely. We next address Petitioner's Eighth Amendment claim.

## C

{30} The United States Supreme Court has held that an inmate advancing a claim of cruel and unusual punishment based on inadequate provision of medical care must establish "deliberate indifference to serious medical needs." *Estelle v. Gamble,* 429 U.S. 97, 106, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). The "deliberate indifference" standard has two components: "an objective component requiring that the pain or deprivation be sufficiently serious; and a subjective component requiring that [prison] officials act with a sufficiently culpable state of mind." *Miller v. Glanz,* 948 F.2d 1562, 1569 (10th Cir.1991). With respect to the subjective component, an inadvertent failure to provide adequate medical care or a negligent diagnosis "fail[s] to establish the requisite culpable state of mind." *Id.* (quoting *Wilson v. Seiter,* 501 U.S. 294, 297, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991)). Thus, "a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment." *Estelle,* 429 U.S. at 106, 97 S.Ct. 285.

{31} Petitioner claims prison officials recklessly exposed him to hepatitis by not segregating him from potentially infectious inmates and by forcing him to clean raw sewage in the cell he shared with infected inmates. A doctor for the Department of Corrections testified that hepatitis B is not easily contracted through casual household contact, but is instead a blood-borne, sexually transmitted disease. The doctor also testified that hepatitis B and C are most often contracted in the penitentiary system

through the common use of intravenous drugs, particularly by the sharing of intravenous or tattoo needles. We conclude the district court's factual finding that "Respondent did not intentionally expose the Petitioner to the hepatitis virus" is supported by substantial evidence, and that the testimony of exposure to hepatitis does not support a claim under the Eighth Amendment.

{32} Petitioner also argues that he was not tested for or vaccinated against hepatitis. Although the record indicates he did not receive a vaccination, the State's doctor testified that he was either tested, counseled, or evaluated for hepatitis B nine times between October 12, 1998, and March 1, 1999. After Petitioner was diagnosed with hepatitis B, the State's doctor ordered a blood draw, and after further treatment, a "serum antigen" was conducted, which turned out to be negative. Petitioner now is no longer infectious. This is not a record of indifference, deliberate or otherwise.

{33} Finally, Petitioner contends that he should have been treated for his hepatitis with the drugs Interferon and Ribaviron. However, the State's doctor testified that only a small percentage of subjects get results from this treatment regimen and few people qualify for its use. In addition, the use of the above drugs may not be medically appropriate in a prison setting because the treatment has debilitating side effects. A mere difference of opinion as to proper or reasonable treatment between the inmate and prison medical personnel does not constitute cruel and unusual punishment. *See Handy v. Price*, 996 F.2d 1064, 1067 (10th Cir.1993) (affirming that a quarrel between a prison inmate and the doctor as to the appropriate treatment for hepatitis did not successfully raise an Eighth Amendment claim).

{34} We conclude that the district court's determination that prison officials were not deliberately indifferent to Petitioner's medical needs is supported by substantial evidence. Accordingly, we hold that the district court did not err in denying Petitioner's Eighth Amendment claims. We therefore affirm the district court on this issue.

## III

{35} For the foregoing reasons, we hold that the district court did not err in determining that Petitioner's transfers to Wallens Ridge was not in retaliation for challenging his conditions of confinement and those of other inmates. We also hold the district court did not err in denying Petitioner's Eighth Amendment claim. Finally, however, we hold that Petitioner was denied due process when spousal visitation was denied indefinitely without notice and an opportunity to be heard. We remand this case to the district court for proceedings consistent with this opinion.

{36} **IT IS SO ORDERED.**

MAES, Chief Justice, SERNA, BOSSON and CHAVEZ, Justices, concur.