## BEARD *v.* FEDERY.

1. The act of August 31st, 1852, relating to appeals from the Board of Land Commissioners to ascertain and settle private land claims in California, created under the act of March 3d, 1851, provides that the filing of a transcript of the decision and proceedings of the board with the clerk of the District Court shall operate *ipso facto* as an appeal on behalf of the party against whom the decision was rendered, and that the attorney-general shall, within six months after receiving a certified transcript of such decree and proceedings, when the decision is against the United States, cause notice to be filed with the clerk that the appeal will be prosecuted, and on failure to give such notice that "the appeal shall be regarded as dismissed." Under this act—

*Held*, that when the attorney-general gave notice that he would not prosecute the appeal, such appeal was for all legal purposes in fact dismissed, and the decree of the board took effect precisely as if no appeal had ever been taken; and an order or decree of the District Court giving leave to the claimant to proceed upon the decree of the board as upon a final decree was a proper disposition of the case.

2. To give jurisdiction to the Board of Land Commissioners to investigate and determine a claim to land alleged to have been derived from the

Spanish or Mexican governments, it is not necessary that the petition of the claimant should aver that such claim was supported by any grant or concession in writing; it is sufficient if the petition allege that the claim asserted was by virtue of a right or title derived from either of those governments. The right or title may rest in the general law of the land.

3. All Mexican grants in colonization, under the decree of 1824 and the regulations of 1828, were made subject to the approval of the Departmental Assembly. Until such approval they were not definitively valid. If not thus approved before the change of jurisdiction, it devolved upon the United States, succeeding under the stipulations of the treaty of cession to the obligations of the former government, to complete what thus remained imperfect. By the act of March 3d, 1851, the United States have declared the conditions under which they will discharge their political obligations to Mexican grantees.

4. The legislation of Congress requiring all claims to lands in California, by virtue of any right or title derived from the Spanish or Mexican governments, to be presented to the Board of Commissioners created under that act for investigation and settlement, and providing that all claims which are not thus presented within a specified period shall be considered and treated as abandoned, is not subject to any constitutional objection, so far as it applies to grants of an imperfect character which require further action of the political department of government to render them perfect.

5. A patent of the United States issued upon a confirmation of a claim to land by virtue of a right or title derived from Spain or Mexico is to be regarded in two aspects,—as a deed of the United States, and as a record of the action of the government upon the title of the claimant as it existed upon the acquisition of California. As a deed its operation is that of a quitclaim, or rather of a conveyance of such interest as the United States possessed in the land, and it takes effect by relation at the time when proceedings were instituted by the filing of the petition before the Board of Land Commissioners. As a record of the government it is evidence that the claim asserted was valid under the laws of Mexico, that it was entitled to recognition and protection by the stipulations of the treaty; and might have been located under the former government, and is correctly located now so as to embrace the premises as they are surveyed and described. As against the government and parties claiming under the government, this record, so long as it remains unvacated, is conclusive.

6. The term "third persons," mentioned in the fifteenth section of the act of March 3d, 1851, against whom the decree and patent of the United States are not conclusive, does not embrace all persons other than the United States and the claimants, but only those who hold superior titles, such as will enable them to resist successfully any action of the government in disposing of the property.

7. In the Federal courts for the California circuit (which have herein

adopted the practice prevailing in the State courts under the State act regulating proceedings in civil cases), not only may distinct parcels of land, if covered by one title, be included in one complaint or declaration, but, with a demand for these, may be united a claim for their rents and profits, or for damages for withholding them.

8. Under this act, the provision as to the description by metes and bounds of the lands sued for, is directory, only.

9. When the pleadings in an action of ejectment do not state the value of the property in controversy, the value may be shown at the trial.

AFTER our conquest of California, in 1846, Congress, by act of 3d March, 1851, "to ascertain and settle the private land claims" in that State* constituted a board of commissioners, in the nature of a judicial body, before which, claims to land there were to be investigated. Every person claiming lands there "by virtue of any *right* or *title* derived from the Spanish or Mexican governments" was to present his claim to this board with the documentary and other evidences of it: notice of depositions, when taken, were to be given to the law officers of the United States. In case of confirmation of the claim, an appeal was given the United States to the District Court; in which case, says the act (§ 10), that court *shall proceed to render judgment* upon the pleadings and evidence in the case, and upon such further evidence as may be taken by order of the said court. If the decree in that court was adverse to the government, an appeal was given to this court. The act declares that "for all claims *finally confirmed* by the said commissioners or by the District Court, or the Supreme Court, a PATENT shall issue to the claimant,"—but that such patent shall be "*conclusive between the United States and the said claimants only, and shall not affect the interests of third persons.*" It declares moreover "that all lands, the claims to which shall not have been presented to the said commissioners within two years after the date of the act, shall be deemed, held, and considered as part of the public domain of the United States."

One section of the act—the 16th—enacts that it shall be "the duty of the commissioners to *ascertain and report* to the

---

* 9 Stat. at Large, 631.

secretary of the interior the *tenure* by which the *Mission . Lands** are held."

A subsequent statute,† that of August 31, 1852, and amendatory of the former act, provides that, when a final decision is rendered by the commissioners,

"It shall be their duty to have two certified transcripts pre-pared of their proceedings and decision, and of the papers and evidence on which the same are founded; one of which tran-scripts shall be filed with the clerk of the proper District Court, and the other shall be transmitted to the Attorney-General of the United States, and the filing of such transcript with the clerk aforesaid shall *ipso facto* operate as an appeal for the party against whom the decision shall be rendered; and if such deci-sion shall be against such private claimant, it shall be his duty to file a notice with the clerk aforesaid, within six months there-after, of his intention to prosecute the appeal; and if the de-cision shall be against the United States, it shall be the duty of the attorney-general, within six months after receiving said tran-script, to cause a notice to be filed with the clerk aforesaid, that the appeal will be prosecuted by the United States; and on a failure of either party to file such notice with the clerk afore-said, the appeal shall be regarded as dismissed."

Under the first act, Alemany, Bishop of Monterey, pre-sented his petition to the commissioners for confirmation of a claim which he made to certain lands described by him, including church lands at the Mission of San José, consist-ing of the church, churchyard, burial-ground, orchard, and vineyard, with the necessary appurtenances; the whole em-bracing a little over nineteen acres of land. His petition averred, in substance, that by the laws of Spain, from time immemorial, and by the laws of the republic of Mexico at the time of the cession of California to the United States, the canon law of the Roman Catholic Church had the force of law in all things relating to the acquisition, transmission, use, and disposal of property, real or personal, belonging

---

* Lands occupied by the Roman Catholic Church missions.
† 10 Stat. at Large, 99.

to the Catholic Church, or devoted to religious purposes, or to the service of God; and that by the same laws it was not necessary that any grant of land for ecclesiastical or church purposes should be proved by any deed or writing, public or private; but the right of the church to the property devoted to religious purposes, &c., was always recognized as regulated by the canon law. That the premises of which he sought confirmation had been for a long term of time devoted to religious purposes and uses, the public worship of God, the administration of the sacraments, and sacrifice of the church; according to the rites, ritual, and ceremonial, of the said Catholic Church. That by the canon law, and the laws of Spain and Mexico, the title, control, and administration of this and all other church property of the same description, absolutely essential to the religious uses and purposes above mentioned, was vested in the bishop and clergy of the diocese, who, for such purposes, were regarded as a body corporate; that the Catholic Church, at the date of the conquest and cession of California to the United States, had been in the actual and undisturbed possession of the premises in question since the year 1797; and that for the purpose of enabling him to hold the property, and rightly administering it for the use of the church, he, the petitioner, had been made a corporation sole by the State of California, under the title of " Bishop of Monterey."

The board confirmed the claim of the bishop. *The United States appealed to the District Court.* Subsequently, however, the attorney-general gave notice that " an appeal would *not* be prosecuted in the case, and the District Court, on the 16th March, 1857, at a stated term, ordered, adjudged, and decreed that the claimant have leave to proceed under the decree of the United States Land Commission, heretofore rendered, in his favor, *as a final decree."*

Thereupon *a patent issued to the bishop, from the United States.* It recited the bishop's petition, the decree of confirmation by the board in his favor, the appeal by the United States, and the notice that it would not be prosecuted, and in usual form gave and granted the lands to the bishop and his suc-

cessors, in trust, &c., having about it every circumstance of formality.

Of the same lands, thus the subject of confirmation and patent to the Bishop of Monterey, one of the governors of California, Pio Pico, on the 20th of June, 1846—Mexico being then invaded by the United States, but the authority and jurisdiction of the Mexican officers not having yet terminated* — made a grant to a certain Castenada and others. The grant recited on its face that the governor had been authorized previously, by the Departmental Assembly, "to alienate the Missions, with the end of preventing their total ruin, and providing the government with the resources which it then immediately for its exigencies required."† Neither the said grant, however, nor any claim founded thereon, had ever been submitted for confirmation to the Board of Land Commissioners; and neither the grant nor any copy or counterpart or record of it, or any paper relating to it, existed or was to be found among the archives of the Mexican government; though the parties who held under it asserted and declared themselves able to prove that it was executed on the day it bore date, and that the consideration-money named in it, $3000, had been on that day paid.

Upon this state of titles, as they appeared from deeds produced or offered, one Federy, claiming title through the patent to the Bishop of Monterey, brought ejectment, in the Circuit Court for the Northern District of California, against Beard, who relied on the title derived under the deed of Governor Pico.

In the State courts of California—their practice in common-law cases being adopted essentially in the Federal tribunals there—a statute allows a plaintiff to unite in the same complaint claims "to recover specific real property, with or without damages for the withholding thereof, or for

* They terminated 7th July, 1846. See United States *v.* Yorba, 1 Wallace, 423.

† For an interesting exhibition of the various documents issued by the Governor of California, in the exigent moment here spoken of, see United States *v.* Workman, 1 Wallace, 753–4.

waste committed thereon, and the rents and profits of the same;" though the same statute provides that such property " shall be described with its *metes and bounds.*" In this case the declaration (or complaint, as it is called in California) demanded three parcels of land, describing one by metes and bounds; one as " having two springs of water thereon, and lying outside of the adobe wall which inclosed a garden and orchard" previously described; and the third as having " a mill-dam and a pond or reservoir of water thereon, lying to the north or northeast, or thereabouts, of the said adobe wall."

The plaintiff, *in the same action,* demanded judgment for possession of the premises, for mesne profits, stated to be $5000 a year, and for costs and damages, the last alleged at $1000. *On the trial,* the claim for mesne profits was stricken out; but it was *then* mutually admitted that the value of the first item of the three parcels claimed, and the only one recovered, was $2500.

After judgment for the plaintiff for one of the parcels, the case came here on error taken by the defendants. Several points were made in their behalf. They were these: *Mr. Wills arguing in support of them:*

1. That under the 10th section of the act of 1851—which says, in terms, that on an appeal from the commissioners to the District Court, that court *shall* proceed to render *judgment* upon the pleadings and evidence in the case—it was the *duty* of that court to proceed and render judgment; that, upon the refusal of the attorney-general to prosecute the appeal, the court should have *dismissed* the appeal or affirmed the decree of the board; that, having done neither, the case was still pending undetermined, and consequently that there had been no decree on which a patent could issue.

2. That the petition of the Bishop of Monterey to the commissioners did not show that he claimed " by virtue of any right or title derived from the Spanish or Mexican government;" on the contrary, that it showed that the missionaries of the Roman Church had had but a permissive possession—though a long, peaceful, and unquestioned one

under government protection—and, therefore, did not show *right* or *title;* but, on the contrary, showed affirmatively *no* right, *no* title. Precedents could be cited in support of this view.* Moreover, the 16th section of the act under which the commissioners sit required them *" to ascertain and report"* to the secretary of the interior the tenure by which the mission lands were held, and by strong inference deprived them of power to pass upon the validity of the claim of the church to them. The lands in question were confessedly of this class. The board, then, had acted on a case without its jurisdiction; and its action was void. The patent founded on its void action was also and equally void. The case fell within *Paterson* v. *Winn,* in this court.†

3. That the grant by Governor Pico—having been, not a grant in colonization, but a sale, according to a recital on its face, made by order of the Departmental Assembly; a sale, too, to save the nation in a crisis of supreme need—vested a good title in the parties under whom Beard claimed, anteriorly to the patent to the Bishop of Monterey; a title not to be divested by any title subsequent to the conquest. The fact that this grant by Governor Pico was not submitted to the commissioners within two years from the 3d March, 1851, was unimportant. The act never meant to destroy titles complete and fully existing anterior to the conquest.

4. That if the commissioners could pass upon the claim of the church to these lands, yet, by the terms of the act of March 3, 1851, the patent is "conclusive between the United States and the claimants *only,*" and does not affect the interests of *third persons;* language which is plain, and conformable to the principles of common law, which deprives no man of his property unless upon hearing. The patent is, therefore, not evidence against the defendants for any purpose, and as between them and the plaintiff the whole subject of title was open.

The plaintiff, therefore, having offered *no legal evidence of*

---

* Nobile *v.* Redman, 6 California, 225; United States *v.* Cruz Cervantes, 18 Howard, 553.

† 11 Wheaton, 380.

*title*, as against the defendants, *they* should have had judgment.

A party who had no title, under any right or title derived from Spain or Mexico, acquired none *as against third parties by a patent from the United States.* A patent in such a case only protected the claimant *against the United States.* His original title or possession must be shown, as against all others.

5. That the two last parcels of land were not described with sufficient certainty; and that the complaint united in one count three distinct causes of action; and united, also, a claim for damages for the rents and profits and detention of the land, with a claim to recover possession; a position which was apparently taken by Mr. Wills without knowledge that the Federal court in California had adopted the State rule of practice in this matter as its own; a fact which the learned judge of the tenth circuit announced from the bench to him, arresting argument on that point.

6. That by striking out from the complaint or declaration the claim for the rents and profits, the court had lost jurisdiction of the case, the argument hereon being that the facts necessary to give jurisdiction must appear affirmatively in the *pleadings;* that here the value of the land, as shown in the pleadings, was made to depend on the amount of damages, viz., $1000, and the claim for mesne profits $5000; that these having been both stricken out, left the court, *under the pleadings*, without jurisdiction, and that this defect of the pleadings could not be supplied by proof or admissions made on the trial.

*Mr. Carlisle, who argued the case thoroughly on principle and precedents, contra.*

Mr. Justice FIELD delivered the opinion of the court.

The plaintiff in the court below deraigned his title by various mesne conveyances from Joseph S. Alemany, Catholic bishop of Monterey, to whom a patent, embracing the premises in controversy, was issued by the United States. The patent is in the usual form, and purports on its face to be

issued under the act of March 3d, 1851, to ascertain and settle private land claims in the State of California. It recites that the bishop presented his claim to the board of commissioners created under that act, for confirmation; that the board, by its decree, rendered on the 18th of December, 1855, confirmed the claim; that an appeal was taken on behalf of the United States to the District Court; and that the attorney-general, having given notice that the appeal would not be prosecuted, the District Court, by its decree, gave leave to the claimant to proceed upon the decree of the board as upon a final decree. Upon this form of the decree of the District Court, thus recited, the defendants below objected to the introduction of the patent, and the objection is pressed in this court. Their position is, that under the tenth section of the act of 1851 it was the duty of the District Court to proceed and render judgment upon the pleadings and evidence in the case; that, upon the refusal of the attorney-general to prosecute the appeal, the court should have dismissed the appeal or affirmed the decree of the board; that, having done neither, the case is still pending undetermined, and consequently there has been no decree on which a patent could issue.

The objection is a very narrow one, and does not merit the attention which it has received from counsel. Its answer is found in the amendatory act of August 31st, 1852. That act provides that when a final decision is rendered by the commissioners they shall prepare two certified transcripts of their proceedings and decision, and of the papers and evidence upon which the same were founded, one of which shall be filed with the clerk of the proper District Court, and the other shall be transmitted to the attorney-general; that the filing of the transcript with the clerk shall operate *ipso facto* as an appeal on behalf of the party against whom the decision is rendered; and, if the decision be against the United States, that it shall be the duty of the attorney-general, within six months after receiving the transcript, to cause a notice to be filed with the clerk that the appeal will be prosecuted; and, on failure to give such notice, "the ap-

peal," says the statute, "shall be regarded as dismissed." If it can be regarded as dismissed, it is for all legal purposes in fact dismissed.   Here the attorney-general did not allow his intention to be drawn from his silence; he announced it at once.   The decree of the court authenticates by its record the refusal of the attorney-general, not leaving this fact open to contestation by oral proof.   The form of the decree is the usual one adopted in such cases, and probably a large number of patents issued to parties in California contain a similar clause.   By the action of the attorney-general the decree of the board took effect precisely as though no appeal had ever been taken, and it certainly cannot constitute any valid objection to the decree of the court that it declares in terms the effect which the law gave to such action.

After the patent was admitted in evidence the defendants produced the petition of the claimant to the Board of Land Commissioners, and insisted that it showed a want of jurisdiction in the board in this, that it did not set forth any right or title derived from the Spanish or Mexican government.   The position of the defendant appears to have been, that the claim of the bishop was invalid because it did not rest upon, or was not sustained by, any direct grant or concession in writing.

The petition sets forth two sources of title, one founded on the laws of Spain and Mexico, and the other on continued possession of the property for a period exceeding half a century.   It avers that, at the time of the conquest and cession of California to the United States, the canon law of the Roman Catholic Church was in force as the law of Mexico, as it had been previously of Spain when Mexico was a dependency thereof, in all things relating to the acquisition, transmission, use, and disposition of property, real and personal, belonging to the church, or devoted to religious uses; that, by the laws of Spain and Mexico, it was not necessary that a grant of land for ecclesiastical or church purposes should appear by deed or writing, public or private, but that the right of the church to such property was always recognized as regulated by the canon law; that the premises in ques

tion, being church lands at the mission of San José, consisting of the church, churchyard, burial-ground, orchard, and vineyard, with the necessary buildings and appurtenances, the whole embracing a little over nineteen acres of land, had for a long period been devoted to religious purposes and uses; that, by the canon law and the laws of Spain and Mexico, the title, control, and administration of all ecclesiastical and church property was vested in the bishop and clergy of the diocese, who, for such purposes, were regarded as a body corporate; and that the Catholic Church, at the date of the conquest and cession of California to the United States, had been in the actual and undisturbed possession of the premises in question since the year 1797.

These averments clearly present a case within the jurisdiction of the Board of Commissioners. They show "a claim by virtue of a right or title derived from the Spanish or Mexican government," which is all that is required by the act of 1851. That act does not define the character of the right or title, or prescribe the kind of evidence by which it shall be established. It is sufficient that the right or title is derived from the Spanish or Mexican government, and it may in some instances rest in the general law of the land, as is the case usually with the title of municipal bodies, under the Spanish and Mexican systems, to their common lands.

The board having acquired jurisdiction, the validity of the claim presented, and whether it was entitled to confirmation, were matters for it to determine, and its decision, however erroneous, cannot be collaterally assailed on the ground that it was rendered upon insufficient evidence. The rule which applies to the judgments of other inferior tribunals applies here,—that when it has once acquired jurisdiction its subsequent proceedings cannot be collaterally questioned for mere error or irregularity.

The grant of Pio Pico, bearing date on the 20th of June, 1846, under which the defendants below claimed title to the greater part of the premises in controversy, was rightly excluded. With the offer of the grant the defendants admitted

that it had never been presented to the Board of Land Commissioners for confirmation, and had never been confirmed. The court treated the grant as one in colonization. All such grants, it is a matter of common knowledge with the profession in California, were made subject to the approval of the Departmental Assembly. Until such approval they were not definitively valid; and no such approval was obtained of the grant in question previous to the 7th of July following, when the jurisdiction of the Mexican authorities was displaced, and the country passed under the government of the United States. It remained for the new government succeeding to the obligations of the former government to complete what thus remained imperfect. By the act of March 3d, 1851, the government has declared the conditions under which it will discharge its political obligations to Mexican grantees. It has there required all claims to lands to be presented within two years from its date, and declared in effect that if, upon such presentation, they are found by the tribunal created for their consideration, and by the courts, on appeal, to be valid, it will recognize and confirm them, and take such action as will result in rendering them perfect titles. But it has also declared in effect, by the same act, that if the claims be not thus presented within the period designated, it will not recognize nor confirm them, nor take any action for their protection, but that the claims will be considered and treated as abandoned. It is not necessary to express any opinion of the validity of this legislation in respect to perfect titles acquired under the former government. Such legislation is not subject to any constitutional objection so far as it applies to grants of an imperfect character, which require further action of the political department to render them perfect.

The Circuit Court, as already stated, treated the grant as one in colonization. This was the most favorable view for the defendants, for if the recitals that it was made upon a sale of mission lands, and upon authority conferred by the Departmental Assembly, are to determine its character, it is without any efficacy in passing the title. It is simply a void

instrument, and falls directly within the decision of this court in the *United States* v. *Workman.** In that case the powers of the Departmental Assembly in the alienation of lands were very fully and elaborately considered, and particularly its asserted power to authorize the governor to sell the mission lands, and it was held that this body could not confer any power upon the governor, and that its own power was restricted to what was conferred by the laws of colonization, which was simply to approve or disapprove of grants regularly made by the governor under those laws.

This grant being laid out of the case, the only question for determination is, whether the defendants constitute third persons within the meaning of the fifteenth section of the act of March 3d, 1851. That section provides that the decree of confirmation and patent shall be conclusive between the United States and the claimants only, and shall not affect the interests of third persons. The position of the defendants is, that as against them the patent is not evidence for any purpose; that as between them and the plaintiff the whole subject of title is open precisely as though no proceedings for the confirmation had been had, and no patent for the land had been issued. Their position rests upon a misapprehension of the character and effect of a patent issued upon a confimation of a claim to land under the laws of Spain or Mexico.

In the first place, the patent is a deed of the United States. As a deed, its operation is that of a quit-claim, or rather of a conveyance of such interest as the United States possessed in the land, and it takes effect by relation at the time when proceedings were instituted by the filing of the petition before the Board of Land Commissioners.†

In the second place, the patent is a record of the action ·of the government upon the title of the claimant as it existed upon the acquisition of the country. Such acquisition did not affect the rights of the inhabitants to their property. They retained all such rights, and were entitled by the law

---

\* 1 Wallace, 745.          † Landes *v.* Brant, 10 Howard, 373.

of nations to protection in them to the same extent as under the former government. The treaty of cession also stipulated for such protection. The obligation, to which the United States thus succeeded, was of course political in its character, and to be discharged in such manner and on such terms as they might judge expedient. By the act of March 3d, 1851, they have declared the manner and the terms on which they will discharge this obligation. They have there established a special tribunal, before which all claims to land are to be investigated; required evidence to be presented respecting the claims; appointed law officers to appear and contest them on behalf of the government; authorized appeals from the decisions of the tribunal, first to the District and then to the Supreme Court; and designated officers to survey and measure off the land when the validity of the claims is finally determined. When informed, by the action of its tribunals and officers, that a claim asserted is valid and entitled to recognition, the government acts, and issues its patent to the claimant. This instrument is, therefore, record evidence of the action of the government upon the title of the claimant. By it the government declares that the claim asserted was valid under the laws of Mexico; that it was entitled to recognition and protection by the stipulations of the treaty, and might have been located under the former government, and is correctly located now, so as to embrace the premises as they are surveyed and described. As against the government this record, so long as it remains unvacated, is conclusive. And it is equally conclusive against parties claiming under the government by title subsequent. It is in this effect of the patent as a record of the government that its security and protection chiefly lie. If parties asserting interests in lands acquired since the acquisition of the country could deny and controvert this record, and compel the patentee, in every suit for his land, to establish the validity of his claim, his right to its confirmation, and the correctness of the action of the tribunals and officers of the United States in the location of the same, the patent would fail to be, as it was intended it should be, an

instrument of quiet and security to its possessor. The patentee would find his title recognized in one suit and rejected in another, and if his title were maintained, he would find his land located in as many different places as the varying prejudices, interests, or notions of justice of witnesses and jurymen might suggest. Every fact upon which the decree and patent rest would be open to contestation. The intruder, resting solely upon his possession, might insist that the original claim was invalid, or was not properly located, and, therefore, he could not be disturbed by the patentee. No construction which will lead to such results can be given to the fifteenth section. The term "third persons," as there used, does not embrace all persons other than the United States and the claimants, but only those who hold superior titles, such as will enable them to resist successfully any action of the government in disposing of the property.

It only remains to notice the objections taken to the complaint in this case. They are advanced in misapprehension of the system of pleading and practice which prevails in the State of California. The system is there regulated by statute, and differs in many important particulars from the system which existed at the common law. There the ancient forms of action are abolished. In every case the plaintiff must state, in ordinary and concise language, his cause of action, with a prayer for the relief to which he may deem himself entitled. The fictions of the action of ejectment at common law have no existence. The names of the real contestants must appear in the pleadings. The complaint, which is the first pleading in the action, must allege the possession or seizin of the premises, or of some estate therein, by the plaintiff, on some day to be designated, the subsequent entry of the defendant, and his withholding the premises from the plaintiff. No other allegations are required, where possession of the property alone is demanded. But in the same action there may be united a claim for the rents and profits, or for damages for withholding the prop

erty, or for waste committed thereon.*   Distinct parcels of land may also be included in the same complaint where they are covered by the same title, and the action equally affects all parties.   The property should be described, if practicable, by metes and bounds; but this is not essential. The provision of the statute on the subject is only directory, its object being to insure such particularity of description, as to enable the officer, who may be charged with the execution of a judgment for the possession, to ascertain the locality and extent of the property.   A description by name, where the property is well known, will often answer equally with the most minute description by metes and bounds.†

This brief statement of the system of pleading and practice existing in California, will furnish the answer to the several objections urged.   That system, with some slight modifications, has been adopted by rule of the Circuit Court of the United States in common-law cases.

When by the consent of parties on the trial the claim for the rents and profits was stricken from the complaint, the court did not lose jurisdiction of the case, because the value of the property did not appear by any allegations of the pleadings.   It was admitted that the first parcel, the only one recovered in the action, was of the value of twenty-five hundred dollars.   This was sufficient, for it has long been the settled practice of the courts of the United States in actions where the demand is not money, and the nature of the action does not require the value of the property in controversy to be stated, to allow the value to be proved at the trial.‡

JUDGMENT AFFIRMED.

---

\* Act regulating proceedings in civil cases, § 64.

† Castro *v.* Gill, 5 California, 40; Doll *v.* Feller, 16 Id. 432; Payne & Dewey *v.* Treadwell, 16 Id. 243.

‡ *Ex parte* Bradstreet, 7 Peters, 647.