176 P.3d 1145 (2007)
2008-NMCA-014
Edwardo MONTOYA, Antonio Montoya, Estavan Montoya, Carlos Montoya, Ricardo Montoya, Daniel Montoya, Tom Gonzales, and Leopoldo Gonzales, Plaintiffs-Appellees,
v.
TECOLOTE LAND GRANT by and through TECOLOTE BOARD OF TRUSTEES, Defendants-Appellants.
No. 26,170.
Court of Appeals of New Mexico.
November 26, 2007.
Certiorari Granted January 16, 2008.
Domenici Law Firm, P.C., Pete V. Domenici, Jr., Charles N. Lakins Albuquerque, NM, for Appellees.
Clara Ann Bowler, Charles R. Thompson, Albuquerque, NM, for Appellants New Mexico Legal Aid, Inc.
Ryan Golten, David Benavides, Margret Carde, Santa Fe, NM, for Amicus Curiae La Merced. Del Pueblo De Chilili, Cañon de Carnué Land Grant, and Anton Chico Land Grant.
Certiorari Granted, No. 30,808, January 16, 2008.

OPINION
VIGIL, Judge.
{1} This is a land grant case in which we are called upon to determine the effect of an Act of Congress confirming the origin, nature, character, and size of the Tecolote Land Grant, and the United States Patent that then conveyed the property to the Town of Tecolote in compliance with the Congressional Confirmation. Relying on documents and conduct that predated the Congressional Confirmation and United States Patent, the district court entered judgment that Plaintiffs acquired private ownership title to a portion of the Tecolote common, lands by adverse possession. Thus, common lands within the Tecolote Land Grant were transformed into Plaintiffs' privately owned land. We conclude that the district court had no authority to alter the terms of the Congressional Confirmation and United States Patent and reverse the judgment of the district court.
GENERAL LAND GRANT HISTORY
{2} The land comprising the Tecolote Land Grant is near what is now Las Vegas, New Mexico. The land was within the province of New Spain called Nuevo Mexico that existed from the late sixteenth century up through the early nineteenth century after Spain colonized the New World and its native pueblo inhabitants. In order to encourage population of the province, Spain issued grants of land to individuals, groups, pueblos, and towns. Two types of grants were generally recognized: individual grants and community land grants. Individual grants were made to specific individuals, while community land grants granted each settler an allotment *1146 of land for a household and a tract of land to farm, with common lands set aside for use by the entire community. The grants to communities and towns were modeled after similar communities established in Spain, where the king had granted lands adjacent to towns for common use by all the residents of the town.
{3} After Mexico achieved independence from Spain in 1821, Mexican officials continued the practice of issuing such land grants to encourage settlements in unoccupied areas and to ward off United States encroachment on Mexican territory. Friction between the United States and Mexico, particularly in Texas, ultimately led to the United States declaring war on Mexico on May 13, 1846. The Mexican-American War ended on February 2, 1848, with the signing of the Treaty of Guadalupe Hidalgo.
{4} The Treaty of Guadalupe Hidalgo gave the United States undisputed control of Texas, established the Rio Grande River as the United States-Mexican border, and ceded to the United States the present-day states of California, Nevada, Utah, parts of Colorado, Arizona, New Mexico, and Wyoming. Article VIII of the Treaty of Guadalupe Hidalgo guaranteed, "In the said territories, property of every kind, now belonging to Mexicans . . . shall be inviolably respected." However, the Treaty of Guadalupe Hidalgo was not self-executing, and Congress established different adjudication systems, by which Mexican landowners were required to demonstrate the legitimacy of their claims under Spanish and Mexican law to have their rights confirmed by the United States.
{5} The first legislation was passed in 1851 to address Spanish and Mexican land grants in California. Act of Mar. 3, 1851, ch. 41, 9 Stat. 631 (1851) (California Commissioner Act) ("An Act to ascertain and settle the private Land Claims in the State of California."). In pertinent part, the Act established a three-person Commission. Id. § 1, 9 Stat. at 631. All persons claiming lands in California by virtue of any right or title derived from the Spanish or Mexican government were required to submit a claim for such lands to the Commission within two years after the statute was enacted. Id. § 13, 9 Stat. at 633. The Commission heard from the claimant and a United States agent who was required to be present at all Commission meetings to "superintend the interests of the United States," and all testimony before the Commissioners was required to be transcribed. Id. §§ 4, 9, 9 Stat. at 631-32. The claimant and the United States were both entitled to appeal the Commission's decision to the United States District Court, where the court could consider new evidence as well as the evidence presented to the Commission. Id. §§ 10-13, 9 Stat. at 633-34. Either party could then appeal the district court decision to the United States Supreme Court. Id. After the claim was confirmed by Congress, the grant was surveyed by the Surveyor General of California, the survey was submitted to the General Land Office of the Interior Department, and a United States patent was issued to the claimant. Id. § 13, 9 Stat. at 633-34.
{6} Congress established a completely different system to address Spanish and Mexican land grant claims in the New Mexico Territory. Passed in 1854, the New Mexico Surveyor General Act created the Office of the Surveyor General to conduct administrative proceedings to determine the status of land grant claims. This Act directed:
That it shall be the duty of the Surveyor[] General, under such instructions as may be given by the Secretary of the Interior, to ascertain the origin, nature, character, and extent of all claims to lands under the laws, usages, and customs of Spain and Mexico; and, for this purpose, may issue notices, summon[ witnesses, administer oaths, and do and perform all other necessary acts in the premises. He shall make a full report on all such claims as originated before the cession of the territory to the United States by the treaty of Guadalupe Hidalgo, of eighteen hundred and forty-eight, denoting the various grades of title, with his decision as to the validity or invalidity of each of the same under the laws, usages, and customs of the country before its cession to the United States; and shall also make a report in regard to all pueblos existing in the Territory, showing the extent and locality of each, stating the number of inhabitants in the said pueblos, respectively, and the nature of their titles to the land. Such report *1147 to be made according to the form which may be prescribed by the Secretary of the Interior; which report shall be laid before Congress for such action thereon as may be deemed just and proper, with a view to confirm bona fide grants, and give full effect to the treaty of eighteen hundred and forty-eight between the United States and Mexico [The Treaty of Guadalupe Hidalgo]; and, until the final action of Congress on such claims, all lands covered thereby shall be reserved from sale or other disposal by the government, and shall not be subject to the donations granted by the previous provisions of this act.
Act of July 22, 1854, ch. 103, § 8, 10 Stat. 308, 309 (1854). The Office of the Surveyor General also employed a presumption of a community land grant if there was proof that a town or village existed on the grant in 1846. Placido Gomez, comment, The History and Adjudication of the Common Lands of Spanish and Mexican Land Grants, 25 Nat. Resources J. 1039, 1069 (1985).
FACTS AND PROCEDURAL BACKGROUND
{7} On October 8, 1824, Salvador Montoya for himself and five other unnamed individuals petitioned the Mexican Constitutional Justice and Corporation of El Bado for a described tract of land to plant corn and other crops. Following the customary protocols, the Constitutional Justice of El Bado placed Salvador Montoya and the other petitioners in judicial possession of the grant on April 23, 1825, and the Tecolote Land Grant was established, with its boundaries as set forth in the petition. Montoya and his companions established farmlands on a portion of the grant.
{8} On January 31, 1838, three different individuals, on behalf of themselves and twenty-four other named individuals petitioned the Honorable Constitutional Alcalde of El Bade to partition the original 1825 grant. At first the petition was denied, because the lands had already been granted to the Salvador Montoya petitioners and some of the lands were being used as commons for grazing. Asserting they needed farms to survive, the petitioners persisted, and asked that they be given at least the surplus lands that remained uncultivated. Eventually, they prevailed, and the local alcalde gathered the petitioners and their families and conducted a "reparto" to divide parcels of farmland among them. The 1838 Repartimiento that resulted divided the original 1825 grant into two parcels. In describing the land allotted to the petitioners, the 1838 Repartimiento referenced the "Wagon Road" as their southern boundary, and it recognized the remaining land to the south and southwest of the "Wagon Road" as in the possession and ownership of Salvador Montoya. Salvador Montoya died in 1840, and his son, Jose Maria Montoya lived continuously on the property from 1839 until his death in 1905.
{9} On July 25, 1856, Hugh Smith, a Santa Fe attorney, addressed a petition to the Surveyor General, requesting confirmation of the Tecolote Land Grant on behalf of two different groups: (1) "The heirs of Salvador Montoya, deceased, for themselves"; and (2) "on behalf of the inhabitants of the [T]own of Tecolote." On December 21, 1856, the Surveyor General determined that the Tecolote Land Grant was good and recommended to Congress that it approve a community grant to the Town of Tecolote, reciting that "[i]t is a well known fact that the [T]own of Tecolote was in existence for some time previous to the cession of the country to the United States, and has continued in existence up to the present date."
{10} On December 22, 1858, the United States Congress confirmed the grant as a community grant to the Town of Tecolote. The Act of 1858 confirming the grant states:
An Act to confirm the Land Claim of certain Pueblos and Towns in the Territory of New Mexico.

Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled, That. . . .
. . . .
. . . the claim . . . of the town of Tecolote in the county of San Miguel [having been] reported for the favorable action of Congress, by the said [Surveyor General] on the thirtieth of September, eighteen hundred and fifty-seven . . . to the Department of the Interior, be, and [is] hereby, confirmed; and the Commissioner of the *1148 Land-Office shall issue the necessary instructions for the survey of all of said claims, as recommended for confirmation by the said [Surveyor General], and shall cause a patent to issue therefor as in ordinary cases to private individuals: Provided, That this confirmation shall only be construed as a relinquishment of all title and claim of the United States to any of said lands, and shall not affect any adverse valid rights, should such exist.
APPROVED, December 22, 1858.
Act of Dec. 22, 1858, ch. 5, 11 Stat. 374, 374 (1858) (emphasis added).
{11} Neither the Surveyor General recommendation nor the Congressional, Confirmation recognized a private grant to Salvador Montoya or his son, Jose Maria Montoya.
{12} In August 1859, the Deputy Surveyor surveyed and mapped the boundaries of the Tecolote Land Grant, showing that the land grant encompassed an area of 21,637 acres. In December 1881, the Office of the Surveyor General re-surveyed the grant boundaries and determined that the Tecolote Land Grant actually consisted of 48,123 acres. The re-survey, which was filed for record in the Office of the Surveyor General in 1882, located the boundaries as initially set forth in the 1824 petition of Salvador Montoya and the five other unnamed individuals, and defines the exterior boundaries of the Tecolote Land Grant as it currently exists. The lands that the 1838 Repartimiento described as being separated from the original grant are therefore included in the present Tecolote Land Grant.
{13} In 1885, three years after the second survey was filed showing the grant to consist of 48,123 acres, instead of 21,637 acres, attorney Thomas Catron filed a petition with the Commissioner of the General Land Office on behalf of himself and the heirs of Salvador Montoya for confirmation of the original 1824 grant as a private grant, notwithstanding that Congress had previously confirmed the land grant as a community grant to the Town of Tecolote in the 1858 Congressional Confirmation. The General Land Office rejected Catron's petition.
{14} Mr. Catron then appealed to the Secretary of the Interior. In a proceeding "On Appeal Before the Secretary of the Interior," entitled, "In the Matter of the Form of Patent of Private Land Claim Number Seven" Mr. Catron asserted that the patent should be issued to Salvador Montoya for himself and his unnamed five associates, and their heirs and assigns. Therein he recounted how Salvador Montoya, for himself, and five other individuals, "names not mentioned," obtained the land grant from the government of Mexico, and that the heirs of Salvador Montoya, deceased, for themselves and on behalf of the inhabitants of the Town of Tecolote had obtained confirmation of the land grant from the Surveyor General and then Congress under the 1854 Act. He argued that "the remaining duties of the Commissioner and the Secretary of Interior are purely ministerial; merely to issue the patent to the person or persons to whom the grant was made, as evidenced by the original muniments of title." He asserted, "The grant was not made to any town, but was made to Salvador Montoya, and his five associates, whoever they may have been." Mr. Catron contended, "The government of the United States has no right to divest the title from Salvador Montoya and his heirs." He concluded:
It cannot be questioned that upon the face of the original muniments of title, the legal title to this grant vested in Salvador Montoya, and his associates named, and that the intention of the Surveyor General was to approve the claim of these parties to this land, and the Act of Congress was intended as a confirmation of the claim and of the rights of the said parties to said grant, and the Commissioner, and Secretary of the Interior should preserve the status and rights of all parties in interest by following the language, or the substance of the language of the original title documents in issuing the patent to Salvador Montoya, and his heirs, and his associates and their heirs and assigns; and thereby leave all claims in the same position with respect to their legal rights as held by them under the Mexican Government prior to the change of sovereignty.
{15} On August 13, 1886, the Department of the Interior rejected Mr. Catron's petition, because "Congress with the whole record before it has confirmed said grant to the *1149 [T]own of Tecolote," and Congress intended to issue a community grant to the Town of Tecolote. The Department of Interior determined that the Patent should follow the provisions of the 1858 Congressional Confirmation, and that the Patent would be issued as a community grant.
{16} On June 21, 1902, the United States issued the Patent to the Town of Tecolote under the signature of President Theodore Roosevelt. The Patent itself recounts how Salvador Montoya for himself and five other individuals obtained the land grant from Mexico in accordance with its laws; how proceedings were conducted by the Surveyor General, who recommended that the grant be confirmed by Congress after finding, "It is a well known fact that the Town of Tecolote was in existence for some time previous to the cession of the Country to the United States and has continued in existence up to the present date"; that the claim was confirmed by Congress in the Act of December 22, 1858; and that the grant had been surveyed. The patent then conveys the land to the Town of Tecolote in the following language:

Now Know Ye, That the United States of America in consideration of the premises and in accordance with the provisions of the aforesaid Act of Congress of the twenty[-]second day of December one thousand eight hundred and fifty[-]eight Has Given and Granted and by these presents Does Give and Grant unto the said Town of Tecolote the tract of land described and embraced in the foregoing survey; but with the proviso contained in the said act of Congress of the twenty-second day of December one thousand eight hundred and fifty-eight, That this patent shall only be construed as a relinquishment of all title and claim of the United States of any of said lands and shall not affect any adverse valid rights, should such exist. To Have and To Hold the said tract of land with the appurtenances unto the said Town of Tecolote its successors and assigns forever with the proviso aforesaid.
(Emphasis added.)
{17} Plaintiffs are some of the descendants of Salvador Montoya and his son, Jose Maria Montoya. In 1999, Plaintiffs initiated the present suit alleging ownership of land located entirely within the exterior boundaries of the Tecolote Land Grant. Plaintiffs claim that the 1825 Mexican land grant as adjusted by the 1838 Repartimiento, as well as adverse possession based on color of title from these Mexican documents, provide superior rights which entitle them to fee simple title of the disputed property. Defendants (Tecolote) are the corporate body and its board of directors established by the Territorial Government of New Mexico in 1903 under NMSA 1978, §§ 49-10-1 to -6 (1903, as amended through 1971) to manage and control the Tecolote Land Grant. They are the successor to the former Town of Tecolote.
{18} Following a non-jury trial, the district court entered findings of fact and conclusions of law and a "Final Judgment for Quiet Title" in favor of Plaintiffs. The district court found that Plaintiffs acquired title to 19,320 acres of the original 48,123 acres of the Tecolote Land Grant through the adverse possession of Salvador Montoya and his son Jose Maria Montoya from 1838 through 1902. The district court found that color of title was established by the valid land grant from the Mexican government in 1825, as adjusted by the 1838 Repartimiento.
{19} The district court ruled that Plaintiffs as successors in interest to Salvador Montoya and his son Jose Maria Montoya have superior title and "valid adverse rights" to the disputed property, which were not affected when Congress confirmed the community land grant and the United States Patent was issued to the Town of Tecolote. The district court viewed the "shall not affect any adverse valid rights" language in the 1858 Congressional Confirmation and the 1902 Patent as relinquishing only the rights of the United States to the property, but not those of any claimants holding "superior title." Specifically, the district court ruled that Plaintiffs have superior title, based on events that pre-dated the issuance of the 1902 Patent, to the disputed property on three bases: (1) by prior vested rights under Mexican law by virtue of the 1825 Mexican grant and the 1838 Repartimiento; (2) by statutory possession and fee simple title pursuant to NMSA 1978, § 47-1-25 (1953), repealed by Act of Apr. 2, 2007, ch. 266, 2007 *1150 N.M. Laws 3150 (rights of persons in possession under Spanish and Mexican grants); and (3) by adverse possession pursuant to NMSA 1978, § 37-1-21 (1979), repealed by 2007 N.M. Laws 3150. Tecolote appeals.
ANALYSIS
{20} Tecolote argues that the district court lacked jurisdiction to address Plaintiffs' claims. The question was preserved for our review by Tecolote's motion for summary judgment, which the district court denied, as well as by Tecolote's requested findings of fact and conclusions of law, which were rejected by the district court.
{21} The issue arises because of Tameling v. United States Freehold & Emigration Co., 93 U.S. 644, 23 L.Ed. 998 (1876). In Tameling, the Supreme Court declared that under the New Mexico Surveyor General Act, Congress did not grant courts with any authority to adjudicate land grant claims in the New Mexico Territory, and under Section 8 of the 1854 Act, the Surveyor General's report "was to be laid before Congress for such action as might be deemed just and proper." Tameling, 93 U.S. at 662. The Supreme Court therefore concluded that under the statute, "The final action on each claim reserved to Congress, is, of course, conclusive, and therefore not subject to review in this or any other forum." Id. Thus, Tameling holds that under the New Mexico Surveyor General Act, when Congress confirms a land grant, its determination concerning the origin, nature, character, and size of a land grant is conclusive and is not subject to attack in a court or any other forum. See id. at 662-63. The Congressional Act in turn determines the status of a land grant under Article VIII of the Treaty of Guadalupe Hidalgo. The holding of Tameling, which we refer to as the Tameling bar, has been consistently followed and applied by the New Mexico Territorial Supreme Court and our own Supreme Court.
{22} Chavez v. Chavez de Sanchez, 7 N.M. 58, 32 P. 137 (1893) was an ejectment action in which the plaintiffs held title to land described in a homestead patent from the United States in 1889. Id. at 62, 32 P. at 137. The defendants who were heirs of purchasers from heirs of Nicolas de Chavez admitted they were in possession of a portion of the land described in the patent but asserted that the land was, part of a perfect grant made to Nicolas de Chavez in 1739. Id. The evidence offered by the defendants to establish the existence of the Mexican grant to Nicolas de Chavez in 1739, was excluded by the district court. Id. at 68, 32 P. at 140. On appeal, the Territorial Supreme Court said the question presented was whether a land claim resting upon a grant from the Mexican government but which was never acted upon by the United States, or any tribunal created by the United States, to pass upon its validity could be superior to a claim of the same land that was based upon a patent from the United States. Id. at 65, 32 P. at 139. The plaintiff argued that even if the 1739 grant to Nicolas de Chavez was perfect under the laws, usages, and customs of Spain and Mexico, evidence of the grant was properly excluded as irrelevant and incompetent because until a tribunal established by Congress for that purpose actually determined whether the grant was valid, the court lacked jurisdiction to determine its value. Id. The Territorial Supreme Court applied the Tameling bar and agreed with the plaintiff, holding that since the Spanish title papers that defendants relied upon were "not confirmed by [C]ongress, or by any tribunal authorized by [C]ongress to examine into and determine the validity of such titles in New Mexico, the papers offered in evidence tending to establish such Spanish title were properly rejected by the court." Chavez, 7 N.M. at 83, 32 P. at 145.
{23} H.N.D. Land Co. v. Suazo, 44 N.M. 547, 105 P.2d 744 (1940), involved common lands within the exterior boundaries of the Tierra Amarilla grant known as the El Paso Ranch. Id. at 548, 105 P.2d at 744. The grant was originally made by the Mexican government in 1832 "unto Manuel Martinez, together with eight sons and some, others who voluntarily desire to accompany him." Id. (internal quotation marks omitted). Pursuant to the New Mexico Surveyor General Act, Congress confirmed and approved the grant as an individual grant to Francisco Martinez, an heir of the original grantee. Id. at 548-49, 105 P.2d at 745. Between 1861 and 1866, Francisco Martinez conveyed title to specific tracts of land to specific individuals but retained the right of "pastures, woods, water, lumbers, watering places, and *1151 roads, common and free." Id. at 549, 105 P.2d at 745 (internal quotation marks and citation omitted). The successors in interest to these deeds asserted: "The clear intention of [Francisco] Martinez . . . was to reserve to all owners of allotted land within the grant, the free and undisturbed perpetual use of all the common and unallotted lands for the purpose of having for the common use, pasture, water, and road-ways according to the custom existing in every settlement." Id. at 550, 105 P.2d at 746 (internal quotation marks omitted). They contended that the Tierra Amarilla grant was originally a community land grant from the Republic of Mexico, and that under the Treaty of Guadalupe Hidalgo, legal title to the common lands passed to the United States as part of a community land grant, impressed with the trust that they were reserved as common lands for use by the entire community. Id. at 550-51, 105 P.2d at 746. Further, they asserted that although by Congress's confirmation of the grant legal title passed to Manuel Martinez, "such title was at all times and still is impressed with this trust." Id. at 552, 105 P.2d at 747. The Supreme Court summarized the argument to be that "the courts will recognize, apply and enforce the terms of the grant and the Treaty of Guadalupe Hidalgo as applied to these lands; and, if the act of [C]ongress confirming the grant conflicts with or undertakes to ignore the provisions of the grant and the Treaty, the terms of the grant and the Treaty must prevail." Id. Applying the Tameling bar, the Supreme Court said:
It is clearly and fully established . . . that until [C]ongress had passed on the validity of such land grant titles (either by act of confirmation, or by decree of a special tribunal created by it for that purpose) the courts are without jurisdiction to consider such a grant; and that after [C]ongress had so acted its action was conclusive and binding on the court. That is to say, in neither case could the courts themselves pass on the meaning, effect or validity of the grant itself being limited to a determination simply of the meaning of the act of [C]ongress confirming the grant.
H.N.D. Land Co., 44 N.M. at 552-53, 105 P.2d at 747.
{24} The Tameling bar has also been consistently applied and followed by the federal courts. For example, Martinez v. Rivera, 196 F.2d 192 (10th Cir.1952), also involved the Tierra Amarilla land grant in the New Mexico Territory, which we have already noted, was confirmed by Congress as a private land grant pursuant to the New Mexico Surveyor General Act. Id. The plaintiffs, who owned large areas of land within the boundaries of the grant, succeeded in their action against members of the Board of County Commissioners of Rio Arriba County to restrain them from proceeding with a special election to elect a board of trustees of the land grant. The court said, "The duty of providing the mode for securing and establishing claims to Spanish and Mexican land titles and fulfilling the [T]reaty of Guadalupe Hidalgo developed upon the political department of the government. Congress could either discharge that duty itself or delegate it to the judicial department," and that under the New Mexico Surveyor General Act, Congress reserved to itself the determination of those claims. Id. at 193-94 (footnote omitted). The court then noted that in a series of opinions beginning with Tameling, "the Supreme Court held that the action of Congress, when taken [pursuant to the New Mexico Surveyor General Act], was conclusive as to the validity and the character or nature of the grant, and was not subject to review by the Supreme Court of the United States or any other judicial tribunal." Martinez, 196 F.2d at 194. In this particular case, since Congress confirmed the grant without qualification or limitation as recommended by the Surveyor General, "[t]he confirmatory act of Congress is final and conclusive and this court may not go behind that act and determine the character or nature of the grant from the antecedent documents." Id. The order granting the injunction was therefore affirmed. Id.
{25} Sanchez v. J.T. Taylor, 377 F.2d 733 (10th Cir.1967), involved the Sangre de Cristo Grant, which was also confirmed by Congress as an individual land grant under the New Mexico Surveyor General Act. Id. at 735. This case was factually very similar to H.N.D. Land Company, and it came to the same result. The defendants asserted, and it *1152 was admitted for purposes of summary judgment, that under Mexican law, settlers on the grant had certain rights in common on the lands of the grant such as grazing and gathering wood. Sanchez, 377 F.2d at 736. The issue presented was whether these rights under Mexican law survived the acquisition of the land by the United States when Congress confirmed title of the grant to an individual person. Id. at 737. Applying the Tameling bar, the court held,
We find no error in the trial court's conclusion that appellants, as a matter of law, have no rights in [the plaintiff s] land under Mexican law or the original grant. Any conflicting rights prior to the confirmatory Act of 1860 which might have arisen or existed by reason of the original grant from Mexico, considered in the light of Mexican law and the Treaty of Guadalupe-Hidalgo, were thereby extinguished.
Sanchez, 377 F.2d at 737.
{26} Plaintiffs assert that notwithstanding the Tameling bar, the district court had jurisdiction based on the specific reservation of third-party rights contained in the 1858 Congressional Confirmation and the 1902 Patent. As quoted above, both documents state that they "shall only be construed as a relinquishment of all title and claim of the United States to any of said lands, and shall not affect any adverse valid rights, should such exist." Based on this language, Plaintiffs contend that the district court had jurisdiction to decide their claims in this case. We disagree.
{27} This language reserving the rights of others was expressed in some form in all the acts of Congress establishing tribunals to implement the Treaty of Guadalupe Hidalgo. Bd. of Trs. of Anton Chico Land Grant v. Brown, 33 N.M. 398, 403, 269 P. 51, 52 (1928) (hereinafter Brown). According to Rodrigues v. United States, 68 U.S. (1 Wall.) 582, 17 L.Ed. 689 (1863), this language was necessary because of the loose and indefinite manner in which grants made by the Mexican government were described, and the grants were not surveyed when they were made. Brown, 33 N.M. at 403, 269 P. at 52. Therefore, two or three grants may have been made for the same land or parts of the same land, which were then presented to Congress for confirmation. Id. This was the exact situation in Brown where Congress confirmed one Mexican land grant for specific property as a community grant and another Mexican grant for the same property as an individual grant. Id. at 398, 269 P. at 51. Thus, Brown was a dispute between two confirmed grantees and the language in the confirmation and patent gave the court jurisdiction to decide which confirmed grant was superior to the other. Id. at 404, 269 P. at 53. There is no dispute between the two confirmed grantees here.
{28} Apart from Brown, there is an additional reason why the third-party language in the Congressional Confirmation and Patent does not assist Plaintiffs. The petition filed by Mr. Catron with the Commissioner of the Land. Office on behalf of himself and the heirs of Salvador Montoya to have the patent issued as a private grant although Congress had already confirmed the grant as a community grant was rejected. Congress itself confirmed the grant as a community grant to the Town of Tecolote, and after administrative hearings and procedures, the Department of the Interior rejected the petition to convert the grant into a private grant. The United States Patent then followed the provisions of the 1858 Congressional Confirmation. In this case, Plaintiffs are challenging the origin, nature, character, and size of the Tecolote Land Grant by seeking a judicial determination that almost 20,000 acres in the Tecolote community land grant now belong to them. Under these circumstances, the third-party language in the Congressional Confirmation and Patent are not a grant of jurisdiction to the district court notwithstanding the Tameling bar. Plaintiffs are not "third parties" within the meaning of the Congressional Confirmation and Patent issued to Tecolote. Plaintiffs' predecessors were actual participants in the proceedings challenging the actions of the United States government and lost.
{29} In line with the foregoing reasoning, we also follow Beard v. Federy, 70 U.S. (3 Wall.) 478, 18 L.Ed. 88 (1865), which involved two different Mexican land grants of the same land. The Bishop of Monterey received a land grant from the Mexican government and after Congress confirmed the *1153 grant under the California Commissioner Act, the United States government issued, its patent to the Bishop of Monterey. Id. at 481-82. The facts also showed that Pio Pico, a Mexican governor of California, made a grant of the same land to other individuals after Mexico was invaded by the United States but before the jurisdiction and authority of the Mexican officers terminated. Id. at 483. However, neither this grant nor any claim founded upon the grant was ever submitted to Congress for confirmation. Id. at 484-85. The issue was whether the plaintiff, claiming title through the United States patent to the Bishop, or the defendant, who relied on the title derived under the deed of Governor Pico, was entitled to the property. Id. at 483. The Supreme Court said:
The [California] [B]oard having acquired jurisdiction, the validity of the claim presented, and whether it was entitled to confirmation, were matters for it to determine, and its decision, however erroneous, cannot be collaterally assailed on the ground that it was rendered upon insufficient evidence. The rule which applies to the judgments of other inferior tribunals applies here,that when it has once acquired jurisdiction its subsequent proceedings cannot be collaterally questioned for mere error or irregularity.
Id. at 489.
{30} The patent to the Bishop contained the same language as does the Patent in this case that it would not affect any adverse valid rights of third persons. Id. at 491. The defendant who claimed under the Governor Pico Grant therefore contended that the superior right as between the plaintiff and the defendant, who owned the land, was an open question as though no proceedings for the confirmation had occurred and no patent for the land had been issued. Id. at 492-93. The United States Supreme Court rejected this argument stating, "The term `third persons,' as there used, does not embrace all persons other than the United States and the claimants, but only those who hold superior titles, such as will enable them to resist successfully any action of the government in disposing of the property." Id. at 493. Thus, the title held through the United States patent granted to the Bishop of Monterey was superior to the title derived from the deed of Governor Pico, and the defendant who claimed title under the Governor Pico grant was deemed to be a mere "intruder." Id. at 492-93. In Brown, our Supreme Court stated that after Beard, "it has been well established that confirmation is conclusive, as against the United States and as against a mere intruder or one claiming a title originating under the United States subsequent to the change of sovereignty." Brown, 33 N.M. at 404, 269 P. at 53. Plaintiffs have the status of "mere intruder[s]" under these decisions instead of status of "third parties" under the Confirmation and Patent. Sanchez explains why:
[E]ven if under Mexican law or the terms of the grant certain settlement rights which conflicted with the congressional confirmation had been given to third persons prior to the [Treaty of Guadalupe], the quit-claim clause would nevertheless be of no avail to appellants, because title had passed to the United States.
377 F.2d at 737.
{31} The three bases on which the district court judgment rests each require Plaintiffs to establish prior vested rights under Mexican law by virtue of the 1825 Mexican Grant and the 1838 Repartimiento or color of title pursuant to them. Plaintiffs acknowledge that the Tecolote Land Grant is a community grant and that the Town of Tecolote is the proper grantee, as set forth in the 1858 Congressional Confirmation and ensuing Patent. Plaintiffs argue they are not challenging the 1858 Congressional Confirmation or the 1902 Patent that followed and that they are not challenging the true origin, nature, character, size, or proper grantee of the Tecolote Land Grant. However, Plaintiffs argue that because they are asserting an adverse claim of superior title to a portion of the property within the grant, the Tameling bar does not apply. We reject this contention. By this action Plaintiffs seek to convert 19,320 acres of the original 48,123 acres of the Tecolote Land Grant into private property. Thus, Plaintiffs are seeking to alter the nature, character, and size of the Tecolote Land Grant. The Tameling bar is directly applicable and bars this action.
*1154 {32} The process chosen by Congress to determine the validity, character, and size of land grants held under the Mexican and Spanish governments, and then issuing United States patents to the owners of the property, resulted in a final determination of land ownership of vast tracts of land that were ceded to the United States by the Treaty of Guadalupe Hidalgo. It provided the owners with security in the ownership of their property. The public policy favoring the finality of these determinations was articulated as follows by the United States Supreme Court in Beard:
It is in this effect of the patent as a record of the government that its security and protection chiefly lie. If parties asserting interests in lands acquired since the acquisition of the country could deny and controvert this record, and compel the patentee, in every suit for his land, to establish the validity of his claim, his right to its confirmation, and the correctness of the action of the tribunals and officers of the United States in the location of the same, the patent would fail to be, as it was intended it should be, an instrument of quiet and security to its possessor. The patentee would find his title recognized in one suit and rejected in another, and if his title were maintained, he would find his land located in as many different places as the varying prejudices, interests, or notions of justice of witnesses and jurymen might suggest. Every fact upon which the decree and patent rest would be open to contestation. The intruder, resting solely upon his possession, might insist that the original claim was invalid, or was not properly located, and, therefore, he could not be disturbed by the patentee.
Id. at 492-93; see also Joplin v. Chachere, 192 U.S. 94, 104, 24 S.Ct. 214, 48 L.Ed. 359 (1904) (stating that a patent "enabled [the grantee], without other proof, to maintain his title in the tribunals of the country. Founded as it would have been upon a survey by the government, it would have removed the doubt as to the boundaries of the tract, which always arises where their establishment rests in the uncertain recollection of witnesses as to ancient possession . . . [and] proved to its possessor an instrument of quiet and security"); St. Louis Smelting & Ref Co. v. Kemp, 104 U.S. 636, 641, 26 L.Ed. 875 (1881) (stating that "[i]t is this unassailable character [of the patent] which gives to it its chief, indeed its only, value, as a means of quieting its possessor in the enjoyment of the lands it embraces . . . being a means of peace and security, . . . [to avoid] constant and ruinous litigation.") To allow Plaintiffs to go behind the United States Patent, and do so almost one hundred years later, to argue that the Tecolote Land Grant had been divested of some of the property in the confirmed grant prior to the issuance of the Patent is exactly what the patent process is designed to prevent. The point of the Tameling bar is that courts should not have to do what Plaintiffs have asked this Court and the district court to doanalyze ancient Mexican documents under American law to ascertain whether they meet, for example, color of title requirements for adverse possession. Congress having already made that determination, we decline to overturn or modify its decision.
CONCLUSION
{33} The judgment of the district court is reversed and the matter is remanded to the district court with instructions to dismiss the complaint.
{34} IT IS SO ORDERED.
WE CONCUR: JAMES J. WECHSLER, and MICHAEL D. BUSTAMANTE, Judges.