**Certiorari Denied, No. 31,764, July 14, 2009**

**IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO**

**Opinion Number: 2009-NMCA-088**

**Filing Date:     May 8, 2009**

**Docket No. 28,388**

**NEW MEXICO GAMEFOWL ASSOCIATION, INC.; CHARLES KENT BULLOCK, d/b/a BULLOCK'S FEED; DON SPEARMAN, d/b/a DD ANIMAL NUTRITION AND SUPPLY; TONY T. ORTEGA, d/b/a MESSILLA VALLEY FEEDS; JOHNNY UNIAS MONTOYA, d/b/a JOHNNY'S SERVICE STATION; RAUL TREVINO, d/b/a LEWALLEN SUPPLY; and PRADIP D. BHAKTA, d/b/a HILLTOP INN,**

       **Plaintiffs-Appellants,**

**v.**

**STATE OF NEW MEXICO ex rel. GARY KING; FARON SEGOTTA; THE HONORABLE BILL RICHARDSON; DOES 1-40,**

       **Defendants-Appellees.**

**APPEAL FROM THE DISTRICT COURT OF LEA COUNTY**
**William A. McBee, District Judge**

Fitch & Tausch, LLC
Thomas G. Fitch
Socorro, NM

Mark L. Pollot
Boise, ID

for Appellants

Gary K. King, Attorney General
David K. Thomson, Assistant Attorney General

1

Eric R. Miller, Assistant Attorney General
Scott Fuqua, Assistant Attorney General
Santa Fe, NM

for Appellees

**OPINION**

**CASTILLO, Judge.**

**{1}** This matter comes before the Court on Plaintiffs' constitutional challenges to the New Mexico cockfighting ban dictated by NMSA 1978, Sections 30-18-1 and -9 (2007). The district court dismissed the complaint based on Plaintiffs' lack of standing and the determination that the challenged statutes were constitutional. Although we hold that the district court erred with respect to its ruling on associational standing, we agree with the district court that the statutes are constitutional, and we therefore affirm.

## I.    BACKGROUND

**{2}** In 2007, our Legislature amended Sections 30-18-1 and -9 in order to effectively ban cockfighting in the state of New Mexico. The amendment to Section 30-18-1 eliminated Subsection K, which had excepted cockfighting from the general prohibition on cruelty to animals. The amendment to Section 30-18-9 created a criminal penalty for persons involved with cockfighting. Plaintiffs, who are the New Mexico Gamefowl Association, Inc. (NMGA) and a number of business owners, filed a complaint in district court against the State of New Mexico, the Governor, the Attorney General, the head of the State Police Department, and forty unnamed individuals (collectively Defendants). The complaint disputes the procedural propriety of the passage of the statutes and the constitutionality of Sections 30-18-1 and -9 under Article II, Section 5 of the New Mexico Constitution.

**{3}** Defendants responded with a motion to dismiss, in which they made four arguments: (1) Plaintiffs have no standing to challenge the cockfighting ban, (2) the courts do not review the Legislature's adherence to procedures that are required by the New Mexico Constitution for the enactment of bills, (3) the challenged procedures do not apply to the enactment of Sections 30-18-1 and -9, and (4) the New Mexico Constitution does not protect cockfighting. After a hearing, the district court granted Defendants' motion, concluding that Plaintiffs lacked standing and that the statutes were constitutional. Plaintiffs appeal the order.

## II.    DISCUSSION

**{4}** Plaintiffs urge reversal on three grounds and argue that (1) Sections 30-18-1 and -9 are void because the Legislature did not follow the procedures for the passage of laws dictated by Article IV, Section 15 of the New Mexico Constitution, (2) Plaintiffs have standing to challenge the constitutionality of Sections 30-18-1 and -9, and (3) Sections 30-

2

18-1 and -9 violate substantive protections of Article II, Section 5 of the New Mexico Constitution. We address each argument in turn.

## A. New Mexico Constitution Article IV, Section 15

**{5}** Article IV, Section 15 of the New Mexico Constitution requires that

> [n]o bill, except bills to provide for the public peace, health and safety, and the codification or revision of the laws, shall become a law unless it has been printed, and read three different times in each house, not more than two of which readings shall be on the same day, and the third of which shall be in full.

Plaintiffs allege in their complaint that the Legislature failed to follow the required constitutional procedure and that, as a result, Sections 30-18-1 and -9 are void. For the purposes of reviewing the district court's dismissal of Plaintiffs' allegations, we treat all facts alleged in the complaint as if they were true. *Prot. & Advocacy Sys. v. City of Albuquerque*, 2008-NMCA-149, ¶ 17, 145 N.M. 156, 195 P.3d 1. In response to Plaintiffs' argument, Defendants counter that courts will not look behind an enacted law in order to ensure that the Legislature complied with the reading rule. We agree with Defendants.

**{6}** In *Kelley v. Marron*, our Supreme Court considered an argument identical to that of Plaintiffs. 21 N.M. 239, 241, 153 P. 262, 262 (1915). A litigant challenged certain legislative acts and asserted that the acts were "not legally enacted." *Id.* The *Kelley* Court began by considering separation of powers principles, *id.* at 243-46, 153 P. at 263-64, and concluded that "[t]he only interpretation which is consistent with the equality and independence of the three departments of government is that such constitutional provisions are directed to them severally, and that upon the department to which the provision is directed rests the responsibility and duty of interpreting and complying therewith." *Id.* at 245, 153 P. at 264. The Court was also concerned with the clarity and the certainty of the law:

> An act of the Legislature, when regularly on file in the office of the secretary of state, is, and must necessarily be, either a law or not a law, and it is preposterous to hold that that which is the law is so only prima facie, or to hold that that which is in fact not a law is even prima facie so. What constitutes the statutory law of a state must necessarily be an absolute proposition, and not simply a prima facie one.

*Id.* at 250, 153 P. at 266 (internal quotation marks and citation omitted). After an extensive review of the law in other jurisdictions, *id.* at 247-64, 153 P. at 264-71, the Court held that the complaint, which challenged the validity of the law, was properly dismissed. *Id.* at 241, 264, 153 P. at 262, 271. Our Supreme Court acknowledged *Kelley*'s holding in *State ex rel. Clancy v. Hall* stating, "courts cannot go behind an enrolled and engrossed bill, properly authenticated, found in the office of the secretary of state as a part of the records of that office." 23 N.M. 422, 431-32, 168 P. 715, 718 (1917); *see State ex rel. Wood v. King*, 93

3

N.M. 715, 719, 605 P.2d 223, 227 (1979) ("[A]n enrolled and engrossed copy, properly signed and authenticated, approved by the Governor and deposited with the Secretary of State, is conclusive as to the regularity of its enactment and the courts may not look behind it to the journals to determine whether constitutional requirements have been met.").

{7}     Plaintiffs posit three arguments in order to support their position that *Kelley* and its progeny should be reexamined:  (1) Legislators commonly do not read bills and are not aware of the actual language; (2) *Kelley* does not account for "vast changes in circumstances, judicial experience, and trends in law"; and (3) a conclusive presumption of regularity violates due process protections.  With regard to Plaintiffs' first concern, *Kelley* stated that "[t]he people are as well able to choose honest and capable lawmakers as they are to choose upright and righteous judges." 21 N.M. at 245, 153 P. at 264.  Although Plaintiffs argue that a lack of judicial review will effectively write the requirements out of the constitution, *Kelley* explained that constitutional mandates are allotted to each of the three branches of government.  *Id.* at 243-44, 153 P. at 263.  Those

> mandates thus given must be held to be directed only to the officers exercising the powers conferred, upon whom rests the responsibility of seeing that their acts comply with such requirements, unless some one of the departments of government has been created with superior powers and prerogatives and given a supervisory control over the other supposedly equal and independent departments of government.

*Id.*  Thus, each branch bears the responsibility for its own procedures.  And the public is not without remedy because "[i]f . . . members of the [Legislature] violate their constitutional duties on adjournment, they can be defeated the next time such offices come up for election, but the remedy is not for the courts."  1 Norman J. Singer, *Statutes and Statutory Construction* § 15:3, at 822 (6th ed. 2002).

{8}     In their second argument, Plaintiffs contend that the law has evolved since *Kelley* and that the "conclusive presumption of the regularity of acts by government officials has given way to the wide-spread use of rebuttable presumptions of regularity."  Plaintiffs argue that it is "illogical" and "nonsensical" to continue to apply *Kelley*'s conclusive presumption. Despite these arguments, "[a] substantial number of states follow the conclusive presumption rule." 1 Singer, *supra*, § 15:3, at 823.  *But see* Ittai Bar-Siman-Tov, *Legislative Supremacy in the United States?:  Rethinking the "Enrolled Bill" Doctrine*, 97 Geo. L.J. 323, 340 (2009) ("Today, only a minority of state courts still follow [the enrolled bill doctrine] while most have modified or completely rejected this doctrine.").  Thus, we disagree that the conclusive presumption outlined by *Kelley* is as outdated as Plaintiffs appear to argue. While we acknowledge that different states may have different approaches to this question, Plaintiffs fail to explain why the procedures of other states should cause New Mexico to deviate from its present system.

{9}     Finally, Plaintiffs challenge *Kelley* on due process grounds.  Based on the statement in the brief in chief, "[w]here a presumption intrudes upon a significant liberty interest it may violate due process of law," Plaintiffs appear to argue that the application of *Kelley* and

4

the conclusive presumption of regularity violate procedural due process protections. In order to establish a violation of due process, Plaintiffs must show that (1) they have a protected liberty interest, and (2) the State failed to provide the minimum procedures necessary to protect the liberty interest. *See Cordova v. LeMaster*, 2004-NMSC-026, ¶ 17, 136 N.M. 217, 96 P.3d 778. Although it is unclear whether Plaintiffs argue that the application of *Kelley* violates federal or state due process protections, we conclude that neither affords Plaintiffs a liberty interest in judicial review of the reading rule.

**{10}** Plaintiffs' liberty interest appears to be rooted in a right of judicial review of the enactment procedures outlined by the New Mexico Constitution. Plaintiffs do not explain or provide citation for the proposition that such judicial review is a constitutionally protected right. Further, the Supreme Court of the United States has long adhered to the conclusive presumption of regularity in the enactment of laws. *See Marshall Field & Co. v. Clark*, 143 U.S. 649, 672-73 (1892). We therefore conclude that Plaintiffs have asserted no protected liberty interest that is entitled to due process protection.

**{11}** Accordingly, we decline to abandon *Kelley* and the long-standing application of the conclusive presumption of regularity and, on these grounds, we affirm the constitutionality of Sections 30-18-1 and -9. *State v. Duarte*, 2004-NMCA-117, ¶ 11, 136 N.M. 404, 98 P.3d 1054 (recognizing that the Court of Appeals is "limited in [its] ability to overrule precedent of our Supreme Court"). Because we conclude that *Kelley* forecloses judicial review of the Legislature's enactment procedure, we do not address whether any of the constitutional exceptions to Article IV, Section 15 of the New Mexico Constitution apply to this case.

**B.     Standing**

**{12}** "Whether a party has standing to bring a claim is a question of law which we review de novo." *Prot. & Advocacy Sys.*, 2008-NMCA-149, ¶ 17. "For purposes of ruling on a motion to dismiss for want of standing, both the trial and reviewing courts must accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party." *Id.* (Internal quotation marks and citation omitted).

**{13}** In order to establish standing, a plaintiff must demonstrate "the existence of (1) an injury in fact, (2) a causal relationship between the injury and the challenged conduct, and (3) a likelihood that the injury will be redressed by a favorable decision." *Id.* ¶ 18 (internal quotation marks and citation omitted). Although New Mexico courts do not require a plaintiff to establish standing as a constitutional threshold, "as a matter of judicial policy if not of jurisdictional necessity, our courts have generally required that a litigant demonstrate injury in fact, causation, and redressability to invoke the court's authority to decide the merits of a case." *ACLU of N.M. v. City of Albuquerque* (*ACLU II*), 2008-NMSC-045, ¶ 10, 144 N.M. 471, 188 P.3d 1222. To that end, "our state courts have long been guided by the traditional federal standing analysis." *Id.*

**{14}** Whether a plaintiff has standing depends on "whether the constitutional or statutory provision on which the claim rests properly can be understood as granting persons in the plaintiff's position a right to judicial relief." *Warth v. Seldin*, 422 U.S. 490, 500 (1975).

5

Plaintiffs in the present case include NMGA, which is an association of bird fanciers, as well as Individual Plaintiffs, a group that includes all of the business owners—feed and animal supply providers, a service station owner, and a hotelier. We first address the standing of Individual Plaintiffs and then turn to the standing of NMGA as an association.

## 1.      Individual Plaintiffs

**{15}**      We begin our analysis of Individual Plaintiffs' standing to challenge the substantive constitutionality of Sections 30-18-1 and -9 by considering the nature of the injuries alleged. The complaint states that Sections 30-18-1 and -9 violate "the constitutionally protected rights of persons in the State of New Mexico to acquire, possess, and use property for the purposes of cockfighting." The language of Section 30-18-9 explains the extent of the Legislature's prohibition on cockfighting. The statute prohibits persons from causing, sponsoring, arranging, holding, or participating in a fight between cocks for the purpose of monetary gain or entertainment. Section 30-18-9(A). "Participation" is defined as "owning or equipping [a] participating [cock] with knowledge of the contest." Section 30-18-9(A)(2). Further, "[i]t is unlawful to train, equip or sponsor a dog or cock for the purpose of having it . . . fight with another dog or cock, respectively, for monetary gain or entertainment." Section 30-18-9(B).

**{16}**      Turning to Individual Plaintiffs' alleged injuries, we first observe that Section 30-18-9(D) criminalizes cockfighting and imposes a series of graduated punishments based on the defendant's number of previous convictions. It is well established that "persons having no fears of state prosecution except those that are imaginary or speculative, are not to be accepted as appropriate plaintiffs." *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979) (internal quotation marks and citation omitted). *Babbitt* further explains that it is necessary for a plaintiff to allege "an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and [that] there exists a credible threat of prosecution thereunder." *Id.* Plaintiffs contend that "[i]t is insupportable to suggest that a statute which would clearly be challengeable by a wide variety of persons with a broad range of interests under ordinary standing rules could become unchallengeable because a criminal penalty has been attached to the law." To that end, Plaintiffs argue that the threat of prosecution test should not apply because statutes with criminal penalties should not be insulated from civil suit simply because the persons challenging the law are not at risk of prosecution. We disagree.

**{17}**      Section 30-18-9, Plaintiffs suggest, has a wide range of effects on persons who do not directly engage in cockfighting, including: the prohibition from participation as spectators, the loss of income or the destruction of business, the destruction of lifestyle because goods and services for birds will not be available, the destruction of lifestyle because showers and breeders might be mistakenly arrested, and the risk of illness in non-fighting birds. Plaintiffs contend that the cases cited by Defendants address criminal laws, the violation of which could only affect the violator—the person who risked prosecution. As a result, Plaintiffs conclude that because of the wide-ranging effect of Section 30-18-9 on persons who have no intention of violating the law, the cited cases—which apply the *Babbitt* test for standing—should not restrict the constitutional challenge of Individual

Plaintiffs.  We are unpersuaded.

**{18}**     Plaintiffs address and attempt to distinguish four cases that were cited by Defendants in the proceedings below:  *Nagol v. New Mexico*, 923 F. Supp. 190 (D.N.M. 1996); *ACLU of N.M. v. City of Albuquerque* (*ACLU I*), 1999-NMSC-044, 128 N.M. 315, 992 P.2d 866; *State v. Salazar*, 98 N.M. 70, 644 P.2d 1059 (Ct. App. 1982); *State v. Marchiondo*, 85 N.M. 627, 515 P.2d 146 (Ct. App. 1973).  In *Marchiondo*, the defendant challenged the constitutionality of a statute, but he challenged a section under which he had not been charged.  85 N.M. at 630, 515 P.2d at 149.  This Court concluded that the defendant had no standing because "[t]he constitutionality of a legislative act is open to attack only by a person whose rights are affected thereby."  *Id.*  The defendant in *Salazar* made a similar claim, and that claim was similarly rejected.  98 N.M. at 70-71, 644 P.2d at 1059-60.

**{19}**     While we agree with Plaintiffs that the defendants in *Marchiondo* and *Salazar* were arguably the only persons who would have been injured by the laws that they attempted to challenge, neither case relied on such a distinction.  In fact, the *Marchiondo* Court incorporated the general premise set forth in *Babbitt* that the constitutionality of a statute may only be challenged by a person whose rights are affected by the statute.  *Marchiondo*, 85 N.M. at 630, 515 P.2d at 149.  In *Marchiondo* and *Salazar*, the plaintiffs' rights were not affected by the strictures of the statute because no charges were filed under the challenged sections.  *Id.*; *Salazar*, 98 N.M. at 70-71, 644 P.2d at 1059-60.  In the present case, the statute imposes a criminal penalty on acts related to cockfighting.  Unless Individual Plaintiffs can demonstrate that the statute restricts behavior in which they engage or intend to engage and that they will be injured as a result of the restriction, Individual Plaintiffs do not have standing to challenge the statute.

**{20}**     The facts of *Nagol* and *ACLU I* are more similar to the present controversy.  The plaintiff in *Nagol* challenged the constitutionality of a statute that required persons to provide identification when requested to do so by a police officer.  923 F. Supp. at 191.  In *ACLU I*, the plaintiffs challenged the constitutionality of a local ordinance, which imposed criminal penalties on minors who were found violating an established curfew.  1999-NMSC-044, ¶¶ 2, 6.  In neither case did the reviewing courts consider whether people in addition to the plaintiffs would be injured by the enforcement of the criminal statute.  *See id.* ¶¶ 8-9; *Nagol*, 923 F. Supp. at 194-96.  Instead, in both cases, the courts reiterated the standard to establish actual injury.  *See* 1999-NMSC-044, ¶ 9 (quoting the standard set forth in *Babbitt*); *see also Nagol*, 923 F. Supp. at 194 (determining that the plaintiff did not have standing because he "failed to credibly establish a sufficient likelihood that he will again be arrested under" the challenged statute).  Because we read these cases to embrace the test set forth in *Babbitt*, we reject Plaintiffs' arguments distinguishing *Marchiondo*, *Salazar*, *Nagol*, and *ACLU I*.  *See Prot. & Advocacy Sys.*, 2008-NMCA-149, ¶ 24 (rejecting a party's factual distinction of *ACLU I* as having no "bearing on the reasoning of the Court").  Accordingly, we consider the allegations of Individual Plaintiffs in order to determine whether there is a credible threat of prosecution under Section 30-18-9.  *See Prot. & Advocacy Sys.*, 2008-NMCA-149, ¶ 21 (reading *ACLU II* to "indicate that a credible threat of prosecution was a critical consideration").

**{21}** Based on the breadth of conduct prohibited by the statute—causing, sponsoring, arranging, holding, or participating in a fight between birds, as well as owning or equipping a bird to fight—we must examine the complaints of each Individual Plaintiff in order to determine whether they have alleged actual injury under *Babbitt*.

### a. Individual Standing

**{22}** Individual Plaintiffs can be divided into two categories for the purposes of evaluating actual injury: Business Plaintiffs and Spectator Plaintiffs. Business Plaintiffs are comprised of DD Animal Nutrition and Supply (DD), Bullock's Feed (Bullock's), Mesilla Valley Feeds (Mesilla), Lewallen Supply (Lewallen), Johnny's Service Station (Johnny's), and Hilltop Inn (Hilltop). DD is a feed store that provides feed, nutritional supplements, and medications to a wide variety of animal owners, including persons who fight birds. Bullock's and Mesilla also supply feed to the gamefowl community, as well as to other animal owners. Lewallen sells cockfighting materials to those who participate in the activity. Johnny's is an automobile fuel and service station that operates in Jal, New Mexico, where cockfighting was conducted before the ban was enacted. Hilltop is a hotel, also located in Jal, which had benefitted from the cockfights that were previously held in the community.

**{23}** Spectator Plaintiffs include Johnny Montoya, the owner of Johnny's, Raul Trevino, the owner of Lewallen, and Pradip Bhakta, the owner of Hilltop. Each Spectator Plaintiff alleged that he attended cockfights and that the ban on the activity deprived him of an aspect of cultural expression. We first consider Business Plaintiffs' standing to challenge the cockfighting ban.

### i. Business Plaintiffs

**{24}** The *Babbit* standard requires us to consider whether Business Plaintiffs have alleged (1) an arguable constitutional interest in continuing to engage in a course of conduct that is prohibited by the challenged statute, (2) an intent to continue to engage in that conduct, and (3) a credible threat of prosecution under Section 30-18-9(A)(2). *See Babbitt*, 442 U.S. at 298. We begin by evaluating whether Business Plaintiffs have alleged an arguable constitutional interest in continuing their activities.

**{25}** Each Business Plaintiff has alleged a purely economic interest. Bullock's alleged that "[t]he ban on cockfighting . . . will irreparably harm Bullock's by significantly reducing its gross receipts, causing the loss of an employee, and making it difficult, if not impossible, for Bullock's to remain in business." DD, Mesilla, Johnny's, Lewallen, and Hilltop allege similar interests. None of these entities explain how their intent to continue to provide services and equipment for cockfighting "deters the exercise of his constitutional rights." *Id.* (Internal quotation marks and citation omitted). Plaintiffs do not argue that continuing to engage in economic activity in a particular manner is conduct that is "arguably affected with a constitutional interest." *Id.* Nor do Plaintiffs provide any authority for the proposition that evidence of economic damage supports that they have even an arguable constitutional interest in continuing to engage in particular business activities.

**{26}** Business Plaintiffs' injuries are distinct from the cultural injuries alleged by the remaining plaintiffs, which we will discuss in subsequent paragraphs. Plaintiffs have specifically rooted the cultural injury argument in Article II, Section 5 of the New Mexico Constitution. Although this argument may not ultimately be viable, the allegations are sufficient to support an "arguable" constitutional interest. *Babbit*, 442 U.S. at 298. Although Plaintiffs have attempted to include the activities of Business Plaintiffs in this constitutional argument by alleging that the cockfighting ban "violates the constitutionally protected rights of persons in the State of New Mexico to acquire, possess, and use property for the purposes of cockfighting," we are unpersuaded that the constitution protects Business Plaintiffs' right to engage in particular business activities so as to avoid the alleged injury—economic loss. *See City of Sunland Park v. Santa Theresa Servs. Co.*, 2003-NMCA-106, ¶ 41, 134 N.M. 243, 75 P.3d 843 ("To be accorded standing on a particular issue the party must show that the statute or constitutional provision relied on reaches or provides protection against the injury."). Because Business Plaintiffs have not demonstrated a connection between constitutional protections and the alleged injury, they have failed to establish an arguable constitutional interest in continuing to engage in their particular business activities. Therefore, they have no individual standing to challenge the constitutionality of Sections 30-18-1 and -9.

### ii.     Spectator Plaintiffs

**{27}** As explained before, Spectator Plaintiffs allege past attendance at cockfights and complain that the cockfighting ban prevents them from future attendance at events that they consider to be an aspect of cultural expression. Section 30-18-9(A) prohibits the knowing participation in a fight between cocks for the purposes of monetary gain or entertainment, and "participation" includes "owning or equipping" a participating animal. Section 30-18-9(A)(2). Spectator Plaintiffs do not allege that they either own or equip participating animals, but rather they focus on their inability to attend these events. We observe that the dogfighting ban does impose a criminal penalty on spectators. Section 30-18-9(A)(1) (defining participation as "being present at a dog fight without attempting to interfere with or stop the contest"). The cockfighting statute, however, does not prohibit such passive involvement in a cockfight. We therefore conclude that Spectator Plaintiffs did not allege an actual injury for the purposes of standing because there is no credible threat of prosecution related to mere attendance at a cockfight.

### b.     Third-Party Standing

**{28}** Although Individual Plaintiffs do not use the term "third-party standing," they allege injuries on behalf of others. Accordingly, we continue our standing analysis in order to determine whether Individual Plaintiffs have third-party standing to challenge Sections 30-18-1 and -9. Third-party standing involves a suit by plaintiffs on behalf of other persons who intend to engage in conduct that will violate a challenged provision. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 562 (1992), 504 U.S. at 562 ("[W]hen the plaintiff is not himself the object of the government action or inaction he challenges, standing is not precluded, but it is ordinarily substantially more difficult to establish." (internal quotation marks and citation omitted)). We examine three criteria in order to determine whether Individual

9

Plaintiffs have standing to bring an action to vindicate the rights of a third party—in the present case, persons who intend to participate in cockfighting. *N.M. Right to Choose/NARAL v. Johnson* (*NARAL*), 1999-NMSC-005, ¶ 13, 126 N.M. 788, 975 P.2d 841. Again, we evaluate the injury in fact, but we also consider the relationship between the litigants and the third party, as well as the ability of the third party to vindicate his or her own interests. *Id.*

**{29}** We have already considered the injuries to the Individual Plaintiffs and have concluded that those alleged injuries were insufficient to establish a credible threat of prosecution under Section 30-18-9. In addition, Individual Plaintiffs have failed to establish the third criteria: they have provided no reason why a person who has violated or intends to violate Section 30-18-9 cannot himself challenge the constitutionality of the statute. *Cf. NARAL*, 1999-NMSC-005, ¶ 14 (explaining that "privacy concerns and time constraints impose a significant hindrance on the ability of Medicaid-eligible women to protect their own interest in obtaining medically necessary abortions"). Any person threatened with prosecution under the statute will "likely be highly motivated to bring such a challenge." *ACLU II*, 2008-NMSC-045, ¶ 32. Accordingly, we conclude that Individual Plaintiffs do not have third party standing to challenge the cockfighting ban, and we affirm the district court. We now turn to the standing of NMGA, as an association, to contest the constitutionality of Sections 30-18-1 and -9.

## 2. Associational Standing

**{30}** Our Supreme Court also addressed associational standing in *ACLU II* and explained that an association has standing to sue on behalf of its members when (1) the members would otherwise have standing to sue, (2) the interests that the association seeks to protect are germane to the association's purpose, and (3) the claim asserted and the relief requested do not require the individual members to participate in the lawsuit. 2008-NMSC-045, ¶ 30. Plaintiffs contend that the district court improperly concluded that NMGA does not have associational standing to sue. We agree.

**{31}** The first element of associational standing is that the individual members of an association would have standing to sue. *See id.* It is well established that an association is required to allege that at least one of its members is "suffering immediate or threatened injury." *Warth*, 422 U.S. at 511. Plaintiffs have alleged that

> [m]any of [NMGA's] members live in rural areas and are devoted to rural lifestyles, of which gamefowl breeding and/or participating in gamefowl shows or fights are, in New Mexico, longstanding, culturally[]bound and significant activities. Most members are working people with families who are likewise involved with the gamefowl community, either as participants in the sport, persons who simply fancy and keep the birds, persons who like to breed and show them, or persons who support the gamefowl community by providing goods and/or services to those who keep, breed, show birds, and/or participate in the sport.

Based on this allegation, the members of NMGA, unlike Individual Plaintiffs, engage in activities that are prohibited by Section 30-18-9, i.e., owning or equipping cocks for the purpose of fighting. As a result, the members of NMGA are at a credible risk of prosecution for these activities. *See ACLU II*, 2008-NMSC-045, ¶ 30.

**{32}** Similarly, NMGA has no difficulty establishing the second element of associational standing: that the claim of unconstitutionality is germane to the organization's purpose. *See id.* The complaint alleges that the NMGA serves the following purpose:

> [T]his corporation is organized solely for binding Breeders, Cockers, and Fanciers of Gamefowl into an organization for their mutual benefit, by keeping the fighting of gamefowl legal in New Mexico and for the exchange of better . . . methods and ideas tending toward perpetuation and improvement of the sport of cocking, various breeds of gamefowl and to cooperate with [s]tate and [f]ederal [a]gencies which seek to control poultry diseases.

Plaintiffs' constitutional attack on the cockfighting ban is germane to NMGA's stated purpose to keep cockfighting legal.

**{33}** Defendants contend that NMGA cannot establish the third element of associational standing because the relief requested in the complaint is not common to NMGA's entire membership. Specifically, Defendants cite *Warth* and argue that because not all of NMGA's members participate in cockfighting, the damages claims are not shared by the entire membership to an equal degree, and each member must be a party to the suit in order to recover for the individual injuries. We are unpersuaded.

**{34}** In *Warth*, the association sought monetary damages for its members. 422 U.S. at 515. The Supreme Court of the United States held that "to obtain relief in damages, each member of [the association] who claims injury as a result of [the] respondents' practices must be a party to the suit, and [the association] has no standing to claim damages on [the member's] behalf." *Id.* at 516. In the present case, the complaint does not seek monetary damages, but instead it seeks a ruling that Sections 30-18-1 and -9 are unconstitutional and requests injunctive relief to prevent the enforcement of the statutes. *Warth* explains that "[i]f in a proper case the association seeks a declaration, injunction, or some other form of prospective relief, it can reasonably be supposed that the remedy, if granted, will inure to the benefit of those members of the association actually injured." 422 U.S. at 515. Thus, NMGA sought relief that can address the injury claimed by the entire membership.

**{35}** Defendants also argue that because Sections 30-18-1 and -9 impose a criminal sanction and an organization cannot be subject to a criminal penalty, NMGA cannot represent its members to challenge the cockfighting ban. Again, we disagree. First, Defendants cite no authority for the proposition that an association cannot have standing to challenge a criminal law on behalf of its members. Second, the law of standing does not require that the organization suffer the injury allegedly caused by the challenged statute. Associational standing may be based either on "whatever rights and immunities the

11

association itself may enjoy" or "the rights of [the association's] members." *Warth*, 422 U.S. at 511. Although the individual members and not the entity face the risk of prosecution, those members are not necessary to the litigation because the relief requested is prospective. *See id.* at 515 (observing that whether an association has standing "depends in substantial measure on the nature of the relief sought").

**{36}** For these reasons, we conclude that NMGA had associational standing to challenge the constitutionality of Sections 30-18-1 and -9. We now turn to the substantive challenges to the cockfighting ban. Although our holding renders NMGA as the only plaintiff with standing, the arguments we address were advanced by Plaintiffs, and we will refer to them as Plantiffs' arguments.

## C.     Article II, Section 5

**{37}** Plaintiffs contend that Article II, Section 5 of the New Mexico Constitution prevents the Legislature from prohibiting cockfighting as a culturally bound use of property. Article II, Section 5 of the New Mexico Constitution states that "[t]he rights, privileges and immunities, civil, political and religious guaranteed to the people of New Mexico by the Treaty of Guadalupe Hidalgo shall be preserved inviolate." At this point, our analysis would typically turn to the content of the Treaty of Guadalupe Hidalgo in order to determine what "rights, privileges and immunities" were guaranteed by Article II, Section 5 of the New Mexico Constitution. Plaintiffs, however, argue that the language of the Treaty and subsequent interpretations of the Treaty should not be the focus of our analysis. Instead, Plaintiffs direct us to consider only "the legislative intent of the framers of [Article II, Section 5 of the New Mexico Constitution]." At the same time, Plaintiffs would have us evaluate deleted provisions of the Treaty and the Protocols of Querétaro—a diplomatic explanation of the deleted provisions—as interpretative aids to the intent of the framers.

**{38}** We fail to see how we can ascertain the intent of the framers without considering the language of the Treaty, the whole of which the framers incorporated into our constitution. A common sense reading of Article II, Section 5 of the New Mexico Constitution demonstrates that the framers intended to do no more than guarantee the people of New Mexico the rights, privileges, and immunities encompassed by the Treaty. Therefore, we examine the language of the Treaty, law interpreting that language, and any other reliable source that will shed light on the rights that the framers intended to convey to the citizens of New Mexico when Article II, Section 5 of the New Mexico Constitution was adopted. *See Prot. & Advocacy Sys.*, 2008-NMCA-149, ¶ 43 ("We construe constitutional amendments and statutes by first looking to the text of the amendment or statute and then turning to other indicators of the intent of the framers of the amendment[.]"). Accordingly, we turn to the language of the Treaty.

**{39}** Plaintiffs do not point to a particular provision or article of the Treaty that can be read to protect cockfighting—or even culturally bound uses of property. Instead, Plaintiffs appear to argue that the Treaty in its entirety, read together with other documents contemporary to the signing of the Treaty, was designed to "ensure that the United States would forever recognize the rights of persons in the ceded territory, and their successors, to

property of all kinds, including all uses of that property recognized by Mexican law and those uses of property which are culturally bound, even where those uses might not be culturally prevalent in the United States." We thus begin with a brief history of the Treaty and an explanation of the documents that Plaintiffs argue are relevant to our analysis.

## 1.      The Treaty

**{40}**      The Treaty was signed in 1848 by the governments of the United States and Mexico in order to end hostilities between those countries. *See* Treaty of Guadalupe Hidalgo, U.S.-Mex., Feb. 2, 1848, *reprinted in* 1 William M. Malloy, *Treaties, Conventions, Int'l Acts, Protocols & Agreements Between the United States of America and Other Powers 1776-1909*, at 1107 (1910) (hereinafter Treaty); *Montoya v. Tecolote Land Grant ex rel. Tecolote Bd. of Trs.*, 2008-NMCA-014, ¶ 3, 143 N.M. 413, 176 P.3d 1145 (filed 2007). The Preamble to the Treaty states that the purpose of the two governments was twofold: first, "to put an end to the calamities of the war," and second, "to establish upon a solid basis relations of peace and friendship, which shall confer reciprocal benefits upon the citizens of both, and assure the concord, harmony, and mutual confidence wherein the two people[] should live, as good neighbors [sic]." Treaty, *supra*, at 1107. We briefly examine the twenty-three Articles of the Treaty in order to discover a basis for Plaintiffs' contention that the New Mexico Constitution, by way of the Treaty, protects citizens' rights to the culturally bound use of property.

**{41}**      Article I simply declares a "universal peace" between the United States and Mexico. Treaty, *supra*, at 1108. Articles II, III, and IV arrange for the suspension of hostilities between the two countries, including the cessation of any blockades, the withdrawal of troops, the restoration to Mexico of "castles, forts, territories, places, and possessions" taken by the United States, and the return of prisoners of war. Treaty, *supra*, at 1108-09. Article V establishes the boundary between the United States and Mexico, and Article VI provides for free passage of the Gulf of California for the "vessels and citizens of the United States," as well as for the construction of certain roads and canals on the river Gila. Treaty, *supra*, at 1109-11. Along those lines, Article VII outlines the rights of the countries to navigate certain rivers. Treaty, *supra*, at 1111.

**{42}**      Article VIII discusses the rights of Mexicans who were living in "territories previously belonging to Mexico." Treaty, *supra*, at 1111. This Article explains that those persons "may either retain the title and rights of Mexican citizens, or acquire those of citizens of the United States" and establishes a timetable for the election of citizenship. *Id.* at 1111-12. In addition, Article VIII protects "property of every kind" belonging to Mexicans who were not at the time residing in the territories that had previously belonged to Mexico and dictates that such property "shall be inviolably respected." Treaty, *supra*, at 1112. Article IX asserts that

> Mexicans who, in the territories aforesaid, shall not preserve the character of
> citizens of the Mexican Republic, conformably with what is stipulated in the
> preceding article, shall be incorporated into the Union of the United States,
> and be admitted at the proper time (to be judged of by the Congress of the

13

United States) to the enjoyment of all the rights of citizens of the United States, according to the principles of the Constitution; and in the mean time, shall be maintained and protected in the free enjoyment of their liberty and property, and secured in the free exercise of their religion without restriction.

Treaty, *supra*, at 1112.

**{43}** As we will explain below, Congress deleted Article X from the Treaty. Treaty, *supra*, at 1112. Article XI concerns the relationship between Mexico, the United States, and Native Americans. Treaty, *supra*, at 1112-13. Articles XII, XIII, XIV, and XV deal with the financial responsibilities of both countries regarding payment for territories, and the payment and discharge of debts and claims. Treaty, *supra*, at 1113-14. In Article XVI, both parties reserve the right to fortify their territories and in Article XVII, the parties revived, in part, an earlier treaty. Treaty, *supra*, at 1115. Articles XVIII, XIX, and XX deal with importation of merchandise into Mexico during the occupation of United States forces and for a period of time afterward. Treaty, *supra*, at 1115-16. Article XXI provides for the amicable resolution of future disputes between the two countries. Treaty, *supra*, at 1117. Article XXII sets forth the rules to be observed in the event that war should again break out between the two countries. Treaty, *supra*, at 1117-18. The final Article, Article XXIII, lays out the procedure for ratification and signing of the Treaty. Treaty, *supra*, at 1118-19. We now turn to review the other documents and provisions that Plaintiffs would have us evaluate.

## 2. Related Documents

**{44}** The Treaty, in its final form, is not the treaty that was negotiated and presented to Congress for ratification. During the ratification process, Congress edited Article IX and deleted Article X in its entirety. *See* Jon Michael Haynes, Comment, *What Is it About Saying We're Sorry? New Federal Legislation and the Forgotten Promises of the Treaty of Guadalupe Hidalgo*, 3 Scholar 231, 251-53 (2001). Although it is lengthy, we offer the entire text of the rejected Article IX in order to provide context for our analysis:

> The Mexicans who, in the territories aforesaid, shall not preserve the character of citizens of the Mexican republic, conformably with what is stipulated in the preceding article, shall be incorporated into the Union of the United States, and admitted as soon as possible, according to the principles of the federal constitution, to the enjoyment of all the rights of the citizens of the United States. In the mean time they shall be maintained and protected in the enjoyment of their liberty, their property, and the civil rights now vested in them according to the Mexican laws. With respect to political rights, their condition shall be on an equality with that of the inhabitants of the other territories of the United States, and at least equally good as that of the inhabitants of Louisiana and the Floridas, when these provinces, by transfer from the French republic and the crown of Spain, became territories of the United States.
> 
> The same most ample guaranty shall be enjoyed by all the

14

ecclesiastics and religious corporations or communities, as well in the discharge of the offices of their ministry, as in the enjoyment of their property of every kind, whether individual or corporate. This guaranty shall embrace all temples, houses, and edifices dedicated to the Roman Catholic worship[]; as well as all property destined to its support, or to that of schools, hospitals, and other foundations for charitable or beneficent purposes. No property of this nature shall be considered as having become the property of the American government, or as subject to be by it disposed of, or diverted to other uses.

Finally, the relations and communication between the Catholics living in the territories aforesaid, and their respective ecclesiastical authorities, shall be open, free, and exempt from all hindrance whatever, even []though such authorities should reside within the limits of the Mexican republic, as defined by this treaty[]; and this freedom shall continue so long as a new demarkation of ecclesiasticals districts shall not have been made, conformably with the laws of the Roman Catholic [C]hurch.

5 Exec. Doc. No. 50, at 16-17 (1849). The ratified Article IX omits the second two paragraphs, both of which were included in the rejected Article IX. *See* Treaty, *supra*, at 1112; 5 Exec. Doc. No. 50, at 16-17. Further, the language "admitted as soon as possible" in the rejected Article IX, 5 Exec. Doc. No. 50, at 16, was changed to "admitted at the proper time (to be judged of by the Congress of the United States)." Treaty, *supra*, at 1112. Small additional changes in the sentence structure of the first paragraph are also apparent. The deleted Article X, in relevant part, stated that "[a]ll grants of land made by the Mexican government, or by the competent authorities in territories previously appertaining to Mexico, and remaining for the future within the limits of the United States, shall be respected as valid, to the same extent that the same grants would be valid if the said territories had remained within the limits of Mexico." 5 Exec. Doc. No. 50, at 17.

**{45}** After the revisions, and after the Mexican government protested those revisions, representatives of the United States government drafted the Protocol of Querétaro (Protocol), which "effectively dictated that the Treaty should be interpreted as if Article X had remained an operative part of the Treaty." Haynes, *supra*, at 255. The Protocol also expressly states that the United States government, in editing Article IX,

did not intend to diminish in any way what was agreed upon by [Article IX and] . . . all the privileges and guarantees, civil, political, and religious, which would have been possessed by the inhabitants of the ceded territories, if the IXth article of the [T]reaty had been retained, will be enjoyed by them, without any difference, under the article which has been substituted.

Treaty, *supra*, at 1119. With regard to Article X, the Protocol states the following:

The American Government by suppressing the Xth article of the [Treaty] did not in any way intend to annul the grants of lands made by Mexico in the ceded territories. These grants, notwithstanding the

15

suppression of the article of the treaty, preserve the legal value which they may possess, and the grantees may cause their legitimate [titles] to be acknowledged before the American tribunals.

Conformably to the law of the United States, legitimate titles to every description of property, personal and real, existing in the ceded territories are those which were legitimate titles under the Mexican law in California and New Mexico up to the 13th of May, 1846, and in Texas up to the 2d [of] March, 1836.

Treaty, *supra*, at 1119 (second alteration in original). The Protocol also described amendments to Article XII, but Plaintiffs concede that those changes are not relevant to the current discussion. Treaty, *supra*, at 1120. The enduring vitality and relevance of the Protocol is uncertain. *See* Christopher David Ruiz Cameron, *One Hundred Fifty Years of Solitude: Reflections on the End of the History Academy's Dominance of Scholarship on the Treaty of Guadalupe Hidalgo*, 5 Sw. J. L. & Trade Am. 83, 89-90 (1998) (explaining that the Secretary of State considered the Protocol to have "no value" and that it was "merely a record of conversations between diplomats and lacked the force or effect of law" (internal quotation marks omitted)). We nonetheless consider its language, together with the edited and deleted provisions of the Treaty, in order to determine whether the framers of the New Mexico Constitution intended to incorporate protections into Article II, Section 5 for culturally bound uses of personal property.

### 3.      The Treaty and the Use of Culturally Bound Property

{46}    With that as background, we reiterate Plaintiffs' core argument:

A complete reading of the Treaty establishes that the [g]overnment of Mexico wanted to ensure that the United States would forever recognize the rights of persons in the ceded territory, and their successors, to property of all kinds, including all of the uses of that property recognized by Mexican law and those uses of property which are culturally bound, even where those uses might not be culturally prevalent in the United States.

Plaintiffs contend that the framers of the New Mexico Constitution intended to provide "broader civil, political, and religious rights protections . . . than that guaranteed by other [f]ederal and [s]tate constitution[s]." As a result, Plaintiffs assert that because they do not seek to enforce the Treaty, but instead the state constitution, the language in the Treaty that limits the rights conferred is not relevant.

{47}    We do not reach Plaintiffs' characterization of the intent of the framers because we are bound by the plain language of the Treaty. Article II, Section 5 of the New Mexico Constitution preserves the "rights, privileges and immunities, civil, political and religious guaranteed to the people of New Mexico by the Treaty of Guadalupe Hidalgo." We are therefore bound by the Treaty and the rights—and limitations on those rights—that were actually conferred by the agreement. After reviewing each provision of the Treaty, we conclude that the only arguably relevant sections of the Treaty are Articles VIII, IX, and X, which concern real and personal property rights. We thus consider each of these Articles,

16

and the accompanying documents relied on by Plaintiffs, in turn.

### a. Article VIII

**{48}** The relevant portion of Article VIII states that the "property of every kind, now belonging to Mexicans not established" in the territories previously belonging to Mexico "shall be inviolably respected," and that "[t]he present owners, the heirs of these, and all Mexicans who may hereafter acquire said property by contract, shall enjoy with respect to it guarantees equally ample as if the same belonged to citizens of the United States." Treaty, *supra*, at 1112. This provision refers to property of every kind, but it extends only those rights that would apply to the same property if it "belonged to citizens of the United States." *Id.* Plaintiffs do not contend that some separate law of the United States protects the culturally bound use of personal property. Therefore, although Article VIII extends its protection to "every kind" of property, those protections are limited to those recognized by the law of the United States and not the law of Mexico. *Id.*; *see Amaya v. Stanolind Oil & Gas Co. (Amaya II)*, 158 F.2d 554, 558 (5th Cir. 1947) ("The fundamental purpose of [Article VIII] was to secure Mexicans in their title and to guarantee to them in that respect the same protection of law that it extended to the citizens of the United States."). Further, even if Article VIII could be read to require the application of the law of Mexico to personal property, Plaintiffs have not alleged any particular Mexican law that protects the culturally bound uses of personal property, either now or at the time that Article II, Section 5 of the New Mexico Constitution was adopted.

### b. Article IX

**{49}** Plaintiffs argue that because the Protocol reserved the rights of the rejected Article IX, the language from that rejected provision can be used to establish an intent to ensure that "the United States would move as quickly as possible to make the ceded territories into States while ensuring that those living in the newly ceded territories would continue to be protected in their property and liberty rights." Plaintiffs ignore the limiting language that accompanied both versions of Article IX.

**{50}** Both the rejected Article IX and the ratified Article IX guarantee that Mexicans in the newly established United States territory may be admitted as citizens of the United States and that when they are admitted, they will enjoy "all the rights of citizens of the United States." Treaty, *supra*, at 1112; 5 Exec. Doc. No. 50, at 16. The very next sentence of the ratified Article IX explains that "*in the mean time*, [they] shall be maintained and protected in the free enjoyment of their liberty and property, and secured in the free exercise of their religion without restriction." Treaty, *supra*, at 1112 (emphasis added). The rejected Article IX reads instead that "*[i]n the mean time* they shall be maintained and protected in the enjoyment of their liberty, their property, and the civil rights now vested in them according to the Mexican laws." 5 Exec. Doc. No. 50, at 16 (emphasis added). Plaintiffs use the Protocol to argue that the revisions did not weaken the protections of the Treaty with regard to cultural practices.

**{51}** First, we fail to see that the excised language provides any more protection for

17

cultural practices than the ratified language.  The rejected Article IX refers to the enjoyment of liberty, property, and civil rights according to Mexican law—it does not, even generally, reach out to cover cultural practices.  The ratified Article IX similarly protects the free "enjoyment of their liberty and property" and condenses the two deleted paragraphs into a succinct protection for "the free exercise of their religion without restriction." Treaty, *supra*, at 1112; 5 Exec. Doc. No. 50, at 16-17.  Despite the assurances of the Protocol that no rights were lost in the revisions, neither article addresses the cultural use of property.

**{52}**    Second, accepting—for the sake of argument only—that Plaintiffs are correct and that the Protocol evidences an intent by the Mexican government that Mexican citizens should retain greater rights in the new territories under familiar Mexican law, both the rejected and the ratified Articles limit the expanded rights until the time that United States citizenship is conferred.  It is well established that

> Article IX of the Treaty, upon which [the d]efendant relies and which protects the free exercise of religion 'in the mean time,' was designed only to address the interim period between the ratification of the Treaty and 'the enjoyment of all the rights of citizens of the United States' once individuals were admitted as citizens following the one year allowed in Article VIII, 9 Stat. 922, for the election of citizenship.

*State v. Fry*, 2006-NMSC-001, ¶ 7 n.2, 138 N.M. 700, 126 P.3d 516 (filed 2005).  We understand Plaintiffs to argue that because Article II, Section 5 of the New Mexico Constitution adopted the privileges and rights of the Treaty and intended for them to apply to all the people of New Mexico, the limitations of the Treaty do not apply.  We are unpersuaded.  As we have explained, we are bound by the language of our constitution, which does not extend the protections of the Treaty beyond the language of the Treaty.

**{53}**    Plaintiffs argue that it is "absurd" to posit that New Mexico cannot confer rights that did not exist in the Treaty itself.  We agree with Plaintiffs that the framers were free to lawfully adopt state constitutional provisions that do not provide less protection than the federal constitution.  Our review of the Treaty, however, demonstrates that the framers *did not* adopt rights that do not exist within the language of the Treaty.  Accordingly, we conclude that Article II, Section 5 of the New Mexico Constitution extends both the protections and the limitations of the Treaty to all of the citizens of New Mexico and that Article IX of the Treaty, even considering the extraneous documents, cannot be read to protect the culturally bound use of personal property.

**c.    Article X**

**{54}**    Although the deleted Article X appears to be concerned only with real  property, Plaintiffs contend that the Protocol demonstrates that the parties to the Treaty—and later, the framers of Article II, Section 5 of the New Mexico Constitution—intended to protect personal property as well as its use.  As we have stated, the United States representatives explained their intentions for deleting Article X in the Protocol as evidenced by the statement that "legitimate titles to every description of property, personal and real, existing

18

in the ceded territories are those which were legitimate titles under the Mexican law" in California, New Mexico, and Texas until certain dates. Treaty, *supra*, at 1119. Plaintiffs argue that bare title to property is meaningless and that it is "the right to use and enjoy property that gives it value and meaning."

**{55}**     Deleted Article X of the Treaty addressed only real property by confining itself to "[a]ll grants of land made by the Mexican government, or by the competent authorities." 5 Exec. Doc. No. 50, at 17. The Protocol refers to title to property, but we see no evidence in either document to indicate that the drafters had in mind the cultural use of personal property. Instead, it would appear that deleted Article X of the Treaty was primarily concerned with existing land disputes in Texas. *Amaya v. Stanolind Oil & Gas Co. (Amaya I)*, 62 F. Supp. 181, 195-96 (S.D. Tex. 1945) (quoting correspondence between the Secretary of State and the Mexican Minister of Foreign Relations at the time that Article X was stricken), *aff'd*, 158 F.2d 554 (Tex. 1946). It would further seem that the language inserted into the Protocol regarding deleted Article X of the Treaty was unauthorized and considered not "obligatory as an international act." *Amaya I*, 62 F. Supp. at 196-98 (quoting the instructions sent by the State Department to Querétaro with the drafters of the Protocol and a later letter from the Secretary of State to the Minster to Mexico regarding the Protocol).

**{56}**     Plaintiffs cite *Nollan v. California Coastal Commission*, 483 U.S. 825 (1987), and maintain that the right to have title to the birds is worthless without the right to the cultural use of the birds. This argument appears to be based on the Fifth Amendment to the United States Constitution, which prohibits the taking of private property for public use without just compensation. U.S. Const. amend. V. The Supreme Court of the United States has explained that "government regulation of private property may be so onerous that its effect is tantamount to a direct appropriation or ouster." *Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 528 (2005). Thus, Plaintiffs argue that the ban on cockfighting is so onerous that it is a direct appropriation of property and that such an effect creates an unconstitutional regulatory taking of property. From there, Plaintiffs seem to suggest that the unconstitutional taking of property can be avoided if we read deleted Article X of the Treaty and the Protocol to protect more than mere title to property, but also to protect its uses. We are not persuaded.

**{57}**     *Nollan* concerned a local building commission that refused to issue a building permit to the property owners unless they would agree to allow the public an easement across their property. 483 U.S. at 828. The Supreme Court of the United States considered this condition for building to amount to an uncompensated taking because "as to property reserved by its owner for private use, the right to exclude [others is] one of the most essential sticks in the bundle of rights that are commonly characterized as property." *Id.* at 831 (alteration in original) (internal quotation marks and citation omitted). The condition imposed by the commission was more than a regulation of property—it was effectively "a permanent physical occupation of the property." *Id.* at 831-32 (alteration in original) (internal quotation marks and citation omitted).

**{58}**     Plaintiffs contend that Sections 30-18-1 and -9 also impose more than a mere regulation of property because the uses of gamefowl are limited, and if they cannot be

19

fought, they have no value or use. We find an analogy to *Nollan* to be inapposite. In *Nollan*, the plaintiffs owned an option to buy the real property, but they could not exercise the option unless they demolished the existing building and rebuilt. 483 U.S. at 828. The conditions set by the commission foreclosed such demolition and rebuilding unless the plaintiffs would permit the public to have access to the property. *Id.* In the present case, the New Mexico Legislature has imposed a ban on cockfighting, and Plaintiffs want to continue to engage in that restricted activity. The test set forth in *Nollan*, the "permanent physical occupation" of property, simply does not apply to the personal property at issue in the present case. *Id.* at 831-32 (internal quotation marks and citation omitted).

**{59}** Instead, we consider *Andrus v. Allard* to better fit the circumstances of the present case. 444 U.S. 51 (1979). In *Andrus*, the federal government imposed a ban that was designed to preserve certain species of birds. *Id.* at 52-53. The law restricted the sale of the birds, as well as their parts, nests, or eggs. *Id.* at 54. The plaintiffs were prosecuted under the law for the sale of Indian artifacts that had been constructed using protected bird parts but that were crafted prior to the passage of the law. *Id.* The complaint alleged, in relevant part, that the law amounted to a regulatory taking of property and violated the Fifth Amendment. *Id.* at 55.

**{60}** The *Andrus* Court explained that "government regulation—by definition—involves the adjustment of rights for the public good." *Id.* at 65. Such an "adjustment curtails some potential for the use or economic exploitation of private property." *Id.* The Court made the following observation:

> The regulations challenged here do not compel the surrender of the artifacts, and there is no physical invasion or restraint upon them. Rather, a significant restriction has been imposed on one means of disposing of the artifacts. But the denial of one traditional property right does not always amount to a taking. At least where an owner possesses a full "bundle" of property rights, the destruction of one "strand" of the bundle is not a taking, because the aggregate must be viewed in its entirety.

*Id.* at 65-66. It was crucial to the Court that the plaintiffs retained "the rights to possess and transport their property, and to donate or devise the protected birds." *Id.* at 66. The Court then reviewed a number of cases that upheld certain regulations limiting trade, particularly the regulation of alcohol. *Id.* at 67. Ultimately, the Court held that "the simple prohibition of the sale of lawfully acquired property in this case does not effect a taking in violation of the Fifth Amendment." *Id.* at 67-68.

**{61}** In the present case, the cockfighting ban does not prevent the ownership or breeding of birds. The ban prevents fighting—one use of the birds—and as a result, only destroys "one strand of the bundle" of property rights. *See id.* at 65-66. Absent evidence of a fight between birds for profit or entertainment, bird owners are not compelled to surrender the birds and there is no physical invasion or restraint on the birds. Viewing the aggregate of property rights in its entirety, we conclude that the restriction of one use for the birds is not a taking. *See id.* at 66 (recognizing that although the law might "prevent the most profitable

20

use" of the property, reduction in value of property "is not necessarily equated with a taking").

**{62}** Because we conclude that Sections 30-18-1 and -9 do not effect a regulatory taking of Plaintiffs' property, we find no constitutional barrier to a literal reading of the language of deleted Article X of the Treaty and the Protocol. Accordingly, we hold that the deleted Article X of the Treaty related only to real property and that the Protocol's explanation of the deletion of Article X refers only to title to property. As a result, the provisions of deleted Article X impose no barrier to our Legislature's enactment of a ban on cockfighting, which restricts the cultural use of certain property.

## III.    CONCLUSION

**{63}** We first decline to review the Legislature's adherence to constitutionally mandated procedures for the enactment of bills. We next conclude that although Individual Plaintiffs have no standing to challenge the constitutionality of Sections 30-18-1 and -9, NMGA does have associational standing to challenge the cockfighting ban. Finally, we conclude that Article II, Section 5 of the New Mexico Constitution does not render the statutory ban on cockfighting unconstitutional. Although we reverse the district court as to NMGA's standing to challenge Sections 30-18-1 and -9, we affirm the judgment.

**{64}    IT IS SO ORDERED.**

_____
**CELIA FOY CASTILLO, Judge**

**WE CONCUR:**

_____
**JAMES J. WECHSLER, Judge**

_____
**LINDA M. VANZI, Judge**

Topic Index for *N.M. Gamefowl Assn., Inc. v. State of NM ex rel Gary King,* No. 28,388

| | |
|---|---|
| **CL** | **CRIMINAL LAW** |
| CL-CR | Cruelty to Animals |
| | |
| **CT** | **CONSTITUTIONAL LAW** |
| CT-SD | Standing |
| | |
| **ST** | **STATUTES** |
| ST-CN | Constitutionality |

21